CHESHIRE MORTGAGE SERVICE, INC. *v.*
LUIS A. MONTES ET AL.
(14304)

SHEA, CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued February 20—decision released June 30, 1992

*Lori Welch-Rubin,* with whom were *David Welch-Rubin* and *Frank B. Cochran,* for the appellants (named defendant et al.).

*William H. Cashman,* with whom, on the brief, was *Tara L. Knight,* for the appellee (plaintiff).

*Richard Blumenthal,* attorney general, and *Neil G. Fishman,* assistant attorney general, filed a brief for the state of Connecticut as amicus curiae.

BORDEN, J. The defendants Luis A. Montes and Dalila Montes[1] (defendants) appeal[2] from the judgment of strict foreclosure by the trial court rendered in favor of the plaintiff, Cheshire Mortgage Service, Inc., on the plaintiff's complaint, and from the judgment rendered in favor of the plaintiff on the defendants' counterclaims. The defendants claim that the trial court's decision was improper because: (1) the terms and conditions of two second mortgage loan transactions were unconscionable; (2) the plaintiff violated the federal Truth in Lending Act (TILA) by its failure accurately to disclose and include, in the finance charge, a fee that it charged the defendants for recording a future assignment of the second mortgage; (3) the plaintiff violated General Statutes § 36-224*l*[3] by charg-

---

[1] The Yale University School of Medicine was also named as a defendant but is not a party in this appeal.

[2] The defendants appealed to the Appellate Court and we transferred the appeal to this court pursuant to Practice Book § 4023.

[3] General Statutes (Rev. to 1987) § 36-224*l* provides: "LIMITATION ON CHARGES. DEMAND FOR PAYMENT PRIOR TO MATURITY. LIABILITY OF LENDER TO BORROWER FOR NONCOMPLIANCE. (a) No person engaged in the secondary mortgage loan business in this state as a lender or a broker, including any licensee under this chapter, and any person who is exempt from licensing under section 36-224c, may (1) charge, impose or cause to be paid, directly or indirectly, as an incident to or a condition of the extension of credit in any secondary mortgage loan transaction, any loan fees, points, commissions, transaction fees or similar prepaid finance charges determined in accordance with chapter 657 and regulations adopted thereunder which exceed in the aggregate ten per cent of the principal amount of the loan or (2) include in the loan agreement upon which loan fees, points, commissions, transaction fees or similar prepaid finance charges have been assessed any provision which permits the lender to demand payment of the entire loan balance prior to the scheduled maturity, except that such

ing the defendants a prepaid finance charge that exceeded 10 percent of the principal amount of the loan; and (4) based on the defendants' first three claims,[4] the plaintiff violated the Connecticut Unfair Trade Practices Act (CUTPA), codified in General Statutes § 42-110a et seq.[5] We reverse and remand the case to the trial court for further proceedings.

The relevant facts are as follows. The defendants were a married couple from Puerto Rico who had been

---

loan agreement may contain a provision which permits the lender to demand payment of the entire loan balance if any scheduled instalment is in default for more than sixty days or if any condition of default set forth in the mortgage note exists.

"(b) Any lender who fails to comply with the provisions of this section shall be liable to the borrower in an amount equal to the sum of: (1) The amount by which the total of all loan fees, points, commissions, transaction fees, other prepaid finance charges, and broker's fees and commissions exceeds ten per cent of the principal amount of the loan; (2) ten per cent of the principal amount of the loan or two thousand five hundred dollars, whichever is less; and (3) the costs incurred by the borrower in bringing an action under this section, including reasonable attorney's fees, as determined by the court, provided no such lender shall be liable for more than the amount specified in this subsection in a secondary mortgage loan transaction involving more than one borrower."

[4] The defendants also claim that the trial court denied them a fair trial. We decline to consider this claim because it was inadequately briefed.

[5] General Statutes § 42-110b of CUTPA provides: "UNFAIR TRADE PRACTICES PROHIBITED. LEGISLATIVE INTENT. (a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

"(b) It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. 45 (a) (1)), as from time to time amended.

"(c) The commissioner may, in accordance with chapter 54, establish by regulation acts, practices or methods which shall be deemed to be unfair or deceptive in violation of subsection (a) of this section. Such regulations shall not be inconsistent with the rules, regulations and decisions of the federal trade commission and the federal courts in interpreting the provisions of the Federal Trade Commission Act.

"(d) It is the intention of the legislature that this chapter be remedial and be so construed."

living on the mainland of the United States for more than twenty years. In February, 1984, the defendants purchased a home in New Haven for $25,000.[6] They financed the purchase with a down payment of $3000 and a $23,700 mortgage loan from People's Bank, with monthly mortgage payments of $407. In July, 1987, Tech Energy, a Connecticut home repair and improvement company, contacted Dalila Montes and offered to provide vinyl siding for the defendants' home at a cost of approximately $10,000. The defendants agreed to purchase the siding, and thereafter Tech Energy submitted a loan application of the defendants to the Tolland Bank in order to finance the cost of the siding. The loan application stated that the defendants had a monthly income of $1195. Tolland Bank denied the application.

Tech Energy then submitted the same Tolland Bank loan application to the plaintiff in order to obtain a second mortgage loan. The plaintiff approved the loan based upon the following factors, in addition to the information contained in the loan application. The plaintiff had obtained a credit report indicating that the defendants had been regularly paying their first mortgage loan to People's Bank. The plaintiff also took into consideration the fact that there was "good loan equity in this case" and that the funds were going to be used to improve the property and, thus, the security for the loan. Furthermore, Dalila Montes stated to the plaintiff's president that, in addition to the income listed on the application form, Luis Montes "had some additional income" from work in "some sort of trade." Neither the plaintiff nor the defendants documented the amount of this additional income or its specific source. On the basis of the foregoing information, the plaintiff approved the loan and placed the defendants in a "no-income verification loan program." Under the "no-

---

[6] On October 10, 1990, the property was appraised at $90,000.

income verification loan program'' the plaintiff did not require the defendants to verify the amount of Luis A. Montes' additional income.

The loan closing was held on November 16, 1987. The defendants were required to grant to the plaintiff a second mortgage on their residence in order to secure the loan. In order for the plaintiff to obtain a second mortgage position, however, it was necessary to pay off three prior liens on the defendants' residence—a lien held by the state for child support in the amount of $8950, a lien held by the city of New Haven welfare department in the amount of $1290.31 and a judgment lien for a medical bill in the amount of $2431. These prior liens on the residence totaled $12,671.31. Therefore, the principal amount of the loan, as stated in the note and the loan closing statement, was $26,500,[7] which included the payment of the prior liens, $9902 for the cost of the siding,[8] $1300 in closing costs,[9] a $2500 prepaid finance charge and $126.69 paid directly to the defendants. The annual interest rate was 18 percent. The promissory note provided that the defendants were to make thirty-five monthly payments of $399.38, and a final ''balloon'' payment of $26,810.61.

[7] While the note and the loan closing statement calculated the principal amount of the loan to be $26,500, this calculation is not necessarily a correct calculation of the principal amount of the loan for purposes of General Statutes § 36-224*l*. See text, infra.

[8] The cost of the siding was apparently $9902. The plaintiff's disclosure statement noted that one half of that amount, or $4951, was to be paid to Tech Energy, and the same amount was to be paid to Peter K. Motti, the plaintiff's closing attorney, as trustee. Apparently, Tech Energy had been paid one half its fee in advance, and the other one half was to be disbursed by Motti as the work progressed.

[9] The plaintiff's disclosure statement disclosed the following closing costs to the defendants for the November 16, 1987 loan:

| | |
|---|---|
| Title fee | $200 |
| Attorney's fee | $750 |
| Document preparation fee | $200 |
| Recording fee | $50 |
| Credit investigation fee | $100 |
| | $1300 |

Approximately seven months later, after they had made seven timely mortgage payments, the defendants sought another loan for approximately $9000 from the plaintiff to be used for additional improvements to their home in order for them to sell it within one year. On the basis of a new credit report indicating that the defendants had continued to pay their first mortgage and had made every payment on the plaintiff's second mortgage, the plaintiff approved the new loan. The loan closing was held on May 26, 1988.[10] The principal amount of the new loan, as stated in the note and the loan closing statement, was $43,500,[11] which included $27,070.05 to pay off the November, 1987 loan, $2451.33 in closing costs,[12] a $4350 prepaid finance charge and $9628.62 paid directly to the defendants. The annual interest rate was 19 percent. The promissory note provided that the defendants were to make thirty-five monthly payments of $691.17, and a final "balloon" payment of $44,075.03. The defendants made no payments on this mortgage loan.[13]

---

[10] The defendants note that the closing for this loan took place in a restaurant parking lot. The closing attorney, Peter K. Motti, testified that the defendants had gotten lost on the way to his office. Motti testified that he had decided that it would be quicker to meet the defendants at the restaurant to close the loan rather than bringing "them through the center of town, because it can be confusing to get to the office."

[11] While the note and the loan closing statement calculated the principal amount of the loan to be $43,500, this calculation is not necessarily a correct calculation of the principal amount of the loan for purposes of General Statutes § 36-224l. See text, infra.

[12] The plaintiff's disclosure statement disclosed the following closing costs to the defendants for the May 26, 1988 loan:

| | |
|---|---|
| Appraisal fee | $200.00 |
| Title fee | $250.00 |
| Attorney's fee | $700.00 |
| Credit life insurance | $1251.33 |
| Recording fee | $50.00 |
| | $2451.33 |

The loan closing statement further broke down the recording fees as twenty dollars to record the mortgage and thirty dollars to record releases.

[13] Almost none of the $9628.62 paid to the defendants was used to improve the house. The defendants' marriage was subsequently dissolved, and some

The plaintiff thereafter filed this foreclosure action. The defendants proffered special defenses, alleging failure to release the November, 1987 mortgage, an unconscionable contract and a violation of General Statutes § 36-224*l*. The defendants also filed counterclaims alleging violations of CUTPA, TILA and § 36-224*l*. The trial court rejected the defendants' special defenses and counterclaims and rendered a judgment of strict foreclosure. The defendants appealed to the Appellate Court and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

I

The defendants' first claim is that the trial court improperly concluded that the terms of the two second mortgage loan transactions were not unconscionable and thus were enforceable. The defendants argue that the loan transactions were procedurally unconscionable, due to the defendants' "lack of knowledge and lack of voluntariness," and that the transactions were substantively unconscionable due to the "oppressive character of the contract terms."[14] We conclude, however, from the facts as found by the trial court and as supported by sufficient evidence in the record, that the mortgage transactions in question were not unconscionable.

We first consider our standard of review of a claim of unconscionability. "The question of unconscionability is a matter of law to be decided by the court based on all the facts and circumstances of the case. *Iamar-*

___

of the loan proceeds were used to pay Dalila Montes' attorney in the dissolution proceeding.

[14] Substantive unconscionability focuses on the "content of the contract," as distinguished from procedural unconscionability, which focuses on the "process by which the allegedly offensive terms found their way into the agreement." J. Calamari & J. Perillo, Contracts (3d Ed.) § 9-37.

*tino* v. *Avallone,* 2 Conn. App. 119, 125, 477 A.2d 124 (1984); see *Hamm* v. *Taylor,* 180 Conn. 491, 493, 429 A.2d 946 (1980). *Fairfield Lease Corporation* v. *Romano's Auto Service,* 4 Conn. App. 495, 498, 495 A.2d 286 (1985). Thus, our review on appeal is unlimited by the clearly erroneous standard. *Iamartino* v. *Avallone,* supra." (Internal quotation marks omitted.) *Texaco, Inc.* v. *Golart,* 206 Conn. 454, 461, 538 A.2d 1017 (1988). This means that the ultimate determination of whether a transaction is unconscionable is a question of law, not a question of fact, and that the trial court's determination on that issue is subject to a plenary review on appeal. It also means, however, that the factual findings of the trial court that underlie that determination are entitled to the same deference on appeal that other factual findings command. Thus, those findings must stand unless they are clearly erroneous. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980). This is particularly apt in a case such as this, where the factual claims involve the extent of the defendants' lack of commercial acumen, their unfamiliarity with the English language resulting in their inability to comprehend the terms of the mortgage that they signed, and their unfamiliarity with the ordinary incidents of mortgage loans. The trial court is in a unique position to assess such factual questions.

"The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise. J. Calamari & J. Perillo, Contracts (3d Ed.) § 9-40." *Edart Truck Rental Corporation* v. *B. Swirsky & Co.,* 23 Conn. App. 137, 142, 579 A.2d 133 (1990). "As applied to real estate mortgages, the doctrine of unconscionability draws heavily on its counterpart in the Uniform Commercial Code which, although formally limited to transactions involving personal property, furnishes a useful guide for real property transactions. *Olean* v. *Treglia,* 190

Conn. 756, 762, 463 A.2d 242 (1983); *Hamm* v. *Taylor*, [supra, 495]." *Iamartino* v. *Avallone,* supra, 125; see generally A. Leff, "Unconscionability and the Code—The Emperor's New Clause," 115 U. Pa. L. Rev. 485, 546, 550–53 (1967); M. Ellinghaus, "In Defense of Unconscionability," 78 Yale L.J. 757, 812–14 (1969). "As Official Comment 1 to § 2-302 of the Uniform Commercial Code suggests, [t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. *Hamm* v. *Taylor,* supra, 495–96." (Internal quotation marks omitted.) *Texaco, Inc.* v. *Golart,* supra, 462. The determination of unconscionability is to be made on a case-by-case basis, taking into account all of the relevant facts and circumstances. Id. Applying this test to the underlying facts found by the trial court, we conclude that the defendants have not established that the mortgage transactions in question were either procedurally or substantively unconscionable.

The defendants argue that the mortgage loan transactions were procedurally unconscionable due to their "lack of knowledge" about the terms of the loans and their "lack of voluntariness" in entering into the loans. The defendants argue that because of their illiteracy in English and their lack of business acumen, the terms of the mortgages unfairly surprised them and that, therefore, there was a "lack of voluntariness" in the transactions. The defendants bolster this claim by the fact that they were unrepresented by counsel in both loan transactions. They contend, moreover, that they did not know that they would have to pay off the prior liens on their home in order to obtain the November, 1987 mortgage loan. Were the defendants' arguments

based upon favorable factual findings, they might well have prevailed on appeal. Their assertions, however, are contrary to the facts found by the trial court.

The trial court found, on the basis of its observation of both defendants, who testified without the aid of a Spanish interpreter, that neither defendant had any difficulty with the English language, in understanding any questions put to them by counsel or the court, or in understanding the judicial proceedings. The court also found that the defendants had entered into a prior mortgage transaction, namely, their first mortgage with People's Bank. The court further found that the defendants were "intelligent and energetic" persons, and that, having lived in the mainland United States for more than twenty years, they understood its judicial, "legal and financial systems." Finally, the court found that the defendants defaulted on the mortgage, not because they did not understand their obligations thereunder or because their income while living together was insufficient to support the mortgage payments, but because the breakdown of their marriage subsequent to the mortgage closing impaired their financial situation. These findings are adequately supported by the evidence in the record.

Both defendants testified that the attorney closing the loan fully explained the documents to them. Luis Montes testified that he had no questions and Dalila Montes testified that she fully understood the terms of the loan. The attorney for the plaintiff testified that he had spent approximately one-half hour fully explaining each document to them. Furthermore, Dalila Montes testified that although the plaintiff's lending officer spoke both English and Spanish, Dalila Montes spoke to her only in English. Regarding the defendants' lack of business acumen, the defendants had been through a loan closing once before when they had purchased their home and, therefore, the trial court was

entitled to infer that they had had some experience with loan transactions. Moreover, although the defendants had a right to be represented by their own counsel, which was fully explained to them by the plaintiff's attorney, the defendants signed a form waiving that right. Also, the plaintiff's president testified that "[e]very customer we work on is told right up front [that] we would have to secure a second position on the security." The trial court could infer from this statement that the defendants were so informed. Further, it is clearly stated on the forms, which were fully explained to the defendants, that the prior liens on their home were being paid. There was evidence, moreover, that the defendants' financial situation had deteriorated after they had separated, and that Dalila Montes had used some of the mortgage proceeds to pay her legal fees resulting from their marital dissolution. Finally, although Dalila Montes testified that she could not read or write in any language and although Luis Montes testified that he speaks English only a "little bit," the trial court was not required to, and did not, credit that testimony.

Thus, the trial court's findings, adverse to the defendants' claims of procedural unconscionability, are supported by the record and are not clearly erroneous. On the basis of those findings and the record, we cannot conclude that this transaction was procedurally unconscionable as a matter of law.

The defendants next argue that the mortgage loan transactions were substantively unconscionable due to the oppressive "mathematics" of the loan transaction. This claim is based on the defendants' contention that they had only the $1195 in monthly income listed on the loan application form with which to pay the $1098 monthly mortgage payments due for the first and second mortgages. Thus, the defendants argue, they were left with only $97 per month for living expenses after

the mortgage payments. On the basis of these figures, they claim "it is obvious that [the plaintiff did not] believe the defendants would make the payments," and that the plaintiff intended only to foreclose on the loan in order to reap the equity in their home. This argument, however, like the defendants' earlier arguments regarding procedural unconscionability, founders on the absence of a factual foundation. First, the trial court did not find either that the plaintiff believed that the defendants would fail to make their mortgage payments, or that the plaintiff intended simply to reap the defendants' equity in the home by making a loan to them that the plaintiff knew they could not repay. Nor is such a finding compelled by this record, because there was evidence to support a contrary finding, namely, that the defendants were able, and considered themselves able, to make the payments.[15]

The plaintiff's president testified that Dalila Montes had told the plaintiff that her husband had additional income. Therefore, the plaintiff could reasonably have believed that the defendants had more monthly income than was reported on the loan application form. Such a belief was somewhat bolstered by the fact that the defendants had made every mortgage payment on their first mortgage and had made all seven payments on the initial, November, 1987 loan.[16] Moreover, the

---

[15] The defendants also argue that the plaintiff abdicated its legal responsibility to them when, through a "no-income verification loan program," it allowed them to determine, without independent documentation of their income, that they could afford to make the mortgage payments. The defendants, however, offer no legal authority for this claim. While it may well be a prudent business practice for a lender to verify the sources of all of a borrower's income, we see no compelling reason to transform such a practice into a rule of law.

[16] After the November, 1987 loan, the defendants were burdened with $806 in monthly mortgage payments, consisting of $407 to People's Bank and $399 to the plaintiff. That sum represented 67 percent of their $1195 monthly income listed on the loan application. Thus, a substantial portion of the defendants' stated income was devoted to shelter. The fact that the

defendants represented to the plaintiff that they intended to use the loan proceeds to improve their home so that they could sell it within one year. Since the defendants had made the previous seven loan payments, there was evidence to support a finding that the plaintiff could have reasonably believed that the defendants would continue to do so until they sold the property within the year. Moreover, the trial court specifically found that the defendants' separation and marital dissolution caused their default. Thus, although in a case where the court has found an intentional reaping of equity a mortgagor might prevail on a claim of unconscionability, this record does not compel such an inference.

The defendants next argue that it was unconscionable for the plaintiff to charge a 10 percent prepaid finance charge on the November, 1987 loan transaction and then charge another 10 percent prepaid finance charge again, within six months, on the May, 1988 loan transaction. We disagree.

General Statutes § 36-224*l* permits a person engaged in the secondary mortgage loan business, such as the plaintiff, to charge prepaid finance charges in an amount not greater than 10 percent of the principal amount of the loan. See footnote 3, supra. The November, 1987 transaction was unrelated to the May, 1988 transaction. The defendants sought the loan in November, 1987, in order to finance vinyl siding for their home. In May, 1988, the defendants sought a loan for additional home improvements, with the intention to sell the property within one year.

Had the defendants obtained the May, 1988 loan from a second mortgage company other than the plaintiff,

defendants nonetheless had been successfully meeting the prior mortgage payments arguably supports an inference that their total actual income exceeded $1195 per month.

that company certainly could have required payment of the November, 1987 loan in order to secure a second mortgage position and could have charged 10 percent in prepaid finance charges pursuant to § 36-224*l*. Thus, the fact that the plaintiff charged the same amount for undertaking a new and increased risk does not ipso facto make this transaction unconscionable. Moreover, there was no evidence that the interest rates or points charged on either loan, or on the two loans taken together, were beyond the ordinary charges then prevailing in the secondary loan market. Indeed, the only evidence regarding that issue was that those charges were "in the middle of the market on the private sector loan." We cannot conclude, therefore, that, solely because the plaintiff charged a total of twenty points on two separate, albeit closely related in time, loan transactions, that the second loan transaction was unconscionable.

In sum, while the defendants may have been imprudent in entering into the May, 1988 transaction, we cannot conclude, on the basis of the record in this case, that the defendants were oppressed or unfairly surprised, or that the terms of the transactions were so one-sided as to be unconscionable as a matter of law.

## II

The defendants' second claim is that the plaintiff violated the federal Truth in Lending Act (TILA) by its failure accurately to disclose and include, as part of the finance charge, a fee that it charged the defendants for recording a future assignment of the May, 1988 mortgage. The defendants seek, therefore, to rescind the May, 1988 mortgage loan transaction. The plaintiff claims that such fees are specifically exempted from the finance charge and, therefore, it was not required to disclose and include such a charge in the finance charge. We agree with the defendants that the plaintiff violated TILA.

The following facts are relevant to this issue. In both the November, 1987 and May, 1988 mortgage loan transactions, the plaintiff included in the amount financed by the defendants a fifty dollar recording fee.[17] In both transactions the plaintiff also charged the defendants a prepaid finance charge. During the trial, the plaintiff's president testified that the fifty dollar recording fee charged in each transaction included fees to record the mortgage, to record any releases, and to record any future assignment of the mortgage to a buyer of the mortgage loan. Thus, in the November, 1987 loan transaction, $27.50 was charged to the defendants to record the mortgage and releases, pursuant to General Statutes § 7-34a (a),[18] and $22.50 was charged to record, in the future, the assignment of the mortgage to a buyer of the mortgage loan.[19] The plaintiff, however,

[17] The amount financed is the amount of credit that is provided to the borrower, as opposed to the finance charge, which is the amount that the credit will cost the borrower. See 12 C.F.R. § 226.18 (1992). Certain fees relating to a loan transaction, such as recording fees, document preparation fees and credit investigation fees, are specifically excluded from the definition of a finance charge and, thus, a lender may include these fees as part of the amount financed, which increases the amount a borrower must borrow. See 12 C.F.R. § 226.4 (1992). The finance charge, conversely, ordinarily consists of the prepaid finance charge, commonly known as the points, and the interest that the borrower will pay over the life of the loan. See 12 C.F.R. § 226.4 (1992).

[18] General Statutes (Rev. to 1987) § 7-34a (a) provides in part: "Town clerks shall receive for recording documents conforming to section 47-36c as follows: For the first page of a warranty deed, a quitclaim deed, a mortgage deed, or an assignment of mortgage, seven dollars and fifty cents; for each additional page of such documents, five dollars; and for each marginal notation of an assignment of mortgage, subsequent to the first two assignments, fifty cents."

[19] In the November, 1987 transaction, the mortgage consisted of two pages and there were three releases, each one page, which were required to release the three prior liens on the defendants' home. Pursuant to General Statutes (Rev. to 1987) § 7-34a (a), the cost of recording the mortgage was $12.50 and the cost of recording the releases was $15, for a total of $27.50. The remainder of the $50 recording fee, or $22.50, was charged to the defendants for the recording of the future assignment of the mortgage.

never assigned the mortgage and, thus, never incurred a recording fee for such an assignment. In the May, 1988 loan transaction, $17.50 was charged to record the mortgage and to record the release of the November, 1987 mortgage, and $32.50 was charged to record any future assignment of the mortgage.[20] This mortgage, however, was also never assigned. The defendants claim that the failure accurately to disclose and include, in the finance charge, the fees charged to the defendants to record a future assignment of the mortgage violated TILA. We agree.

"We approach this question according to well established principles of statutory construction designed to further our fundamental objective of ascertaining and giving effect to the apparent intent of the legislature. *State* v. *Kozlowski,* 199 Conn. 667, 673, 509 A.2d 20 (1986); *Hayes* v. *Smith,* 194 Conn. 52, 57, 480 A.2d 425 (1984). In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. *Dart & Bogue Co.* v. *Slosberg,* 202 Conn. 566, 572, 522 A.2d 763 (1987) . . . . *Texaco Refining & Marketing Co.* v. *Commissioner,* 202 Conn. 583, 589, 522 A.2d 771 (1987)." (Internal quotation marks omitted.) *Lauer* v. *Zoning Commission,* 220 Conn. 455, 459, 600 A.2d 310 (1991).

The federal Truth in Lending Act, as amended in particular by the Truth-in-Lending Simplification Reform

---

[20] In the May, 1988 transaction, the mortgage consisted of two pages and there was one release. Pursuant to General Statutes (Rev. to 1987) § 7-34a (a), the cost of recording the mortgage was $12.50 and the cost of recording the release was $5, for a total of $17.50. The remainder of the $50 recording fee, or $32.50, was charged to the defendants for the recording of the future assignment of the mortgage.

Act of 1980, was enacted as part of the Consumer Credit Protection Act of 1968, and is codified at 15 U.S.C. § 1601 et seq. The purpose of TILA is "to promote the informed use of consumer credit by requiring disclosures about its terms and cost." 12 C.F.R. § 226.1 (b). Title 15 of the United States Code, § 1604 provides that "[t]he Board [of Governors of the Federal Reserve System] shall prescribe regulations to carry out the purposes of this title [15 U.S.C.S. § 1601 et seq.]" That board has promulgated TILA regulations, known as Regulation Z, which are codified at 12 C.F.R. § 226.1 et seq. (Regulation Z).

"The regulations adopted by the Federal Reserve Board pursuant to authority of the Truth in Lending Act require that the cost of credit, or, in the words of the regulations, the 'finance charge' be clearly disclosed and that its component charges be identified." *George v. General Finance Corporation of Louisiana,* 414 F. Sup. 33, 34 (E.D. La. 1976). We must first determine, therefore, whether a fee charged to a borrower to record a future mortgage assignment is a finance charge. If we conclude that such a fee is a finance charge, we must then determine what disclosure requirements TILA imposes on a lender and whether the plaintiff violated TILA by not complying with those requirements.

Regulation Z, § 226.4 (a) defines a finance charge as "the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit."[21] Based on this definition, a fee charged

---

[21] Title 15 of the United States Code, § 1605 similarly defines the term finance charge and provides in part: "(a) FINANCE CHARGE DEFINED. Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended . . . ."

to a borrower to record the future assignment of a mortgage is a finance charge because it certainly is a charge payable directly by the consumer and imposed directly by the creditor as an incident to the extension of credit. This conclusion is bolstered by Regulation Z, § 226.4 (b) (6) which states that a finance charge includes "[c]harges imposed on a creditor by another person for purchasing . . . a consumer's obligation, if the consumer is required to pay the charges in cash as an addition to the obligation . . . ." In the present case, the plaintiff required the defendants to pay in cash a "[charge] imposed on [the plaintiff] by another person [namely, an assignee,] for purchasing . . . [the defendants'] obligation . . . ."

The plaintiff argues, however, that a charge for the future assignment of the mortgage falls within two exemptions from the definition of finance charge—Regulation Z, § 226.4 (c) (7) (i) and (e) (1). We do not agree.

Regulation Z, § 226.4 (c) (7) (i) excludes from the definition of finance charge "[f]ees for title examination, abstract of title, title insurance, property survey, and similar purposes." A fee for recording a future assignment of the mortgage is not a fee for such a "similar [purpose]." The purposes of the specified fees are to ensure that the borrower actually owns the property in question, and that the lender's security interest therein is protected. Recording of a potential future assignment, however, does not share either of those closely related purposes; rather, it relates solely to the lender's future attempt to realize its investment in the mortgage.

Similarly, Regulation Z, § 226.4 (e) (1) specifically exempts certain security interest charges from the definition of finance charge, including "fees prescribed by law that actually are or will be paid to public officials

for . . . perfecting . . . a security interest." A fee for recording a future assignment of the mortgage does not relate to a perfection of the security interest created by the mortgage. That security interest was perfected when the mortgage itself was recorded. Furthermore, those two sections of Regulation Z apply to fees charged to a borrower that relate to the loan transaction at hand. In the present case, the potential assignment of the mortgage to another person would have been unrelated to the loan made to the defendants, but would have related to a separate future transaction between the plaintiff and a buyer of the mortgage loan. Our conclusion is supported by 15 U.S.C. § 1605 (d) and (e), which exclude certain fees from the definition of finance charge if they are fees *"with respect to that transaction."*[22] (Emphasis added.) We conclude, therefore, that

---

[22] Title 15 of the United States Code, § 1605 (d) provides: "ITEMS EXEMPTED FROM COMPUTATION OF FINANCE CHARGE IN ALL CREDIT TRANSACTIONS. If any of the following items is itemized and disclosed in accordance with the regulations of the Board in connection with any transaction, then the creditor need not include that item in the computation of the finance charge *with respect to that transaction:*

"(1) Fees and charges prescribed by law which actually are or will be paid to public officials for determining the existence of or for perfecting or releasing or satisfying any security related to the credit transaction.

"(2) The premium payable for any insurance in lieu of perfecting any security interest otherwise required by the creditor in connection with the transaction, if the premium does not exceed the fees and charges described in paragraph (1) which would otherwise be payable." (Emphasis added.)

Title 15 of the United States Code, § 1605 (e) provides: "ITEMS EXEMPTED FROM COMPUTATION OF FINANCE CHARGE IN EXTENSIONS OF CREDIT SECURED BY AN INTEREST IN REAL PROPERTY. The following items, when charged in connection with any extension of credit secured by an interest in real property, shall not be included in the computation of the finance charge *with respect to that transaction:*

"(1) Fees or premiums for title examination, title insurance, or similar purposes.

"(2) Fees for preparation of a deed, settlement statement or other documents.

"(3) Escrows for future payments of taxes and insurance.

"(4) Fees for notarizing deeds and other documents.

"(5) Appraisal fees.

"(6) Credit reports." (Emphasis added.)

a fee charged to a borrower to record the future assignment of a mortgage is a finance charge and that since, in the present case, the charge was paid at the consummation of the transaction, it was a prepaid finance charge.[23] Our conclusion is in accord with at least one other court. See *In re Brown,* 106 B.R. 852 (Bankr. E.D. Pa. 1989); but see *Shroder* v. *Suburban Coastal Corporation,* 729 F.2d 1371 (11th Cir. 1984).[24]

Having concluded that the fee charged to the defendants to record the future assignment of the mortgage was a prepaid finance charge, we next consider what disclosure requirements TILA imposed on the plaintiff and whether the plaintiff complied with such requirements. A lender is required to make "material disclosures" to a borrower and, if it fails to do so, the borrower has the right to rescind the loan transaction. Regulation Z, § 226.23 (a) (3). Regulation Z, § 226.23 (a) (3) n.48 provides that "[t]he term *material disclosures* means [inter alia,] the required disclosures of the . . . finance charge . . . ." (Emphasis in original.) Regulation Z, § 226.18 requires: "For each transaction the creditor shall disclose the . . . (d) . . .

---

[23] Regulation Z, § 226.2 (a) (23) defines prepaid finance charge as "any finance charge paid separately in cash or by check before or at consummation of a transaction or withheld from the proceeds of the credit at any time."

[24] These two cases appear to be the only cases in which this issue has been considered. The plaintiff's reliance on *Shroder* v. *Suburban Coastal Corporation,* 729 F.2d 1371 (11th Cir. 1984), for the proposition that a charge to borrowers for the recording of a future assignment of a mortgage is not a finance charge, is tenuous. In that case, the court noted that "[t]he fee for recording assignment of the mortgage was sufficiently itemized on the Truth-in-Lending disclosure statement. There was no lumping together of various fees under the heading 'official fees.' The item 'recording fees' was broken down into deed, mortgage, and other. The fee for recording assignment of the mortgage was entered under the item 'other.' " Id., 1382. In the present case, unlike in *Shroder,* nowhere on the plaintiff's disclosure statement was the charge to record the future assignment of the mortgage disclosed.

finance charge . . . ."[25] Regulation Z, § 226.18 (c) (1) (iv) further mandates a lender to itemize, in the amount financed, the "prepaid finance charge." Thus, the failure of a lender accurately to disclose both the prepaid finance charge and the overall finance charge constitutes a violation of TILA.

In the present case, the prepaid finance charge that was disclosed to the defendants in the November, 1987 loan transaction was $2500. The actual finance charge, however, that should have been disclosed was $2522.50, which included the $22.50 future mortgage assignment recording fee that was charged to the defendants. Similarly, the finance charge that was disclosed to the defendants in the May, 1988 loan transaction was $4350. The actual finance charge, however, that should have been disclosed was $4405, which included the $32.50 charge to the defendants for the future assignment of the May, 1988 mortgage and the $22.50 charge to the defendants for the future assignment of the November, 1987 mortgage, mortgages that were never actually assigned.[26] Thus, the plaintiff failed accurately to disclose and include the future mortgage assignment recording fee in the prepaid finance charge. Since this charge was not included in the prepaid finance charge, the overall finance charge was also underdisclosed. This resulted in a material nondisclosure in violation of TILA and, therefore, the defendants had the right to rescind the May, 1988 loan transaction. We recognize that non-

[25] Title 15 of the United States Code, § 1638 (a) (3) similarly mandates a creditor to disclose the " 'finance charge', not itemized, using that term."

[26] Regulation Z, § 226.20 (a), entitled "Refinancings," provides that "[t]he new finance charge [in a refinancing] *shall include any unearned portion of the old finance charge* that is not credited to the existing obligation." (Emphasis added.) Since, as we have concluded, the $22.50 future mortgage assignment recording fee charged to the defendants in the November, 1987 loan transaction was a finance charge, and since that recording fee was never incurred by the plaintiff and was thus an "unearned portion of the old finance charge" in the May, 1988 refinancing, it should have been included as part of the finance charge in the May, 1988 loan transaction.

disclosure of a $55 fee may seem minuscule in the context of a $43,500 loan transaction. "However, once the court finds a violation, no matter how technical, it has no discretion with respect to the imposition of liability." *Grant* v. *Imperial Motors*, 539 F.2d 506, 510 (5th Cir. 1976); see also *Lewis* v. *Award Dodge, Inc.*, 620 F. Sup. 135 (D. Conn. 1985) (failure of creditor to disclose $1 as filing fee to list creditor's security interest violated TILA).[27]

Having concluded that the plaintiff violated TILA by failing accurately to disclose and include, in the prepaid finance charge, the future mortgage assignment recording fee, we next turn to the defendants' remedies for such a violation. Regulation Z, § 226.23 (a) (1) provides that "[i]n a credit transaction in which a security interest is or will be retained . . . each consumer . . . shall have the right to rescind the transaction . . . ." Regulation Z, § 226.23 (a) (3) further provides that "[i]f the required . . . material disclosures are not delivered, the right to rescind shall expire 3 years after consummation [of the transaction] . . . ."[28] Thus, the defendants had the right to rescind the May, 1988 loan transaction within three years of the consummation of the loan transaction. The defendants claim

[27] We note that even though a technical violation of TILA subjects a lender to liability, 15 U.S.C. § 1640 (c) provides that "[a] creditor . . . may not be held liable . . . for a [TILA] violation . . . if the creditor . . . shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error . . . ." That section further provides, however, that "an error of legal judgment with respect to a person's obligations under this subchapter is not a bona fide error." Since the plaintiff's decision not to include the future mortgage assignment fee in the finance charge was an error of legal judgment with respect to its obligations under TILA, it was not a bona fide error.

[28] Title 15 of the United States Code, § 1635 (f) similarly provides that "[a]n obligor's right of rescission shall expire three years after the date of consummation of the transaction . . . notwithstanding the fact that the information and forms required under this section or any other disclosures required under this chapter . . . have not been delivered to the obligor . . . ."

that since they rescinded the loan on October 15, 1990, within three years of the May, 1988 transaction, they timely rescinded the transaction. Because the issue of whether the defendants effectively rescinded the transaction was not considered by the trial court and was not briefed on appeal, we remand the case to the trial court for a determination of the rights and remedies afforded the defendants for the plaintiff's TILA violation.

## III

The defendants' third claim is that the plaintiff violated General Statutes § 36-224*l*; see footnote 3, supra; in the May, 1988 loan transaction by charging the defendants a prepaid finance charge that exceeded 10 percent of the principal amount of the loan. On the basis of our analysis in part II of this opinion, we agree.

Section 36-224*l* (a) provides in relevant part that "[n]o person engaged in the secondary mortgage loan business in this state as a lender or a broker . . . may (1) charge . . . directly or indirectly, as an incident to or a condition of the extension of credit in any secondary mortgage loan transaction, any loan fees, points, commissions, transaction fees or similar prepaid finance charges determined in accordance with chapter 657 and regulations adopted thereunder which exceed in the aggregate ten per cent of the principal amount of the loan . . . ." The statute is clear and unambiguous on its face that a second mortgage lender cannot charge a prepaid finance charge that exceeds 10 percent of the principal amount of the loan. In the present case, the principal amount of the May, 1988 loan was $39,150.[29]

[29] The plaintiff calculated, in the note and in the loan closing statement, that the principal amount of the loan was $43,500. See footnote 11, supra. That calculation, however, was incorrect because it included, in the principal amount, the prepaid finance charge. Such a charge should have been categorized as interest, and not principal. The plaintiff also included the closing costs as part of the principal amount of the loan. Ordinarily, clos-

As we concluded in part II of this opinion, the actual amount of the prepaid finance charge was $4405[30] or approximately 11 percent of the principal amount of the loan.[31] Therefore, the plaintiff violated § 36-224*l*[32]

ing costs are not part of the principal since a borrower pays those costs at the closing either out of the borrower's own pocket or by a reduction in the amount of the loan proceeds disbursed to the borrower. In the present case, however, it is clear from the record that the defendants borrowed the amount of the closing costs from the plaintiff which, in turn, increased the principal amount of the loan. We thus conclude that the principal amount of the loan was $39,150 which included $27,070.05 to pay off the November, 1987 loan, $2451.33 in closing costs and $9628.62 paid directly to the defendants.

[30] Pursuant to General Statutes § 36-224*l*, the maximum amount that the plaintiff could have charged the defendants in prepaid finance charges was $3915 since the principal amount of the loan was $39,150. Therefore, the plaintiff overcharged the defendants by $490.

[31] The defendants also claim that the finance charge, together with the loan closing costs, such as the appraisal fees, title fees and attorney's fees must not exceed 10 percent of the principal amount of the loan. The defendants argue that by the plain language of General Statutes § 36-224*l*, all "transaction fees," including closing costs, must be considered when determining whether a lender has exceeded the 10 percent limit. We conclude that the defendants' construction of the statute is incorrect.

"According to the rule of ejusdem generis, unless a contrary intent appears, where general terms are followed by specific terms in a statute, the general terms will be construed to embrace things of the same general kind or character as those specifically enumerated. 2A J. Sutherland, Statutory Construction (4th Ed. Sands) § 47.17; see also *Eastern Connecticut Cable Television, Inc.* v. *Montville,* 180 Conn. 409, 413, 429 A.2d 905 (1980); *Easterbrook* v. *Hebrew Ladies Orphan Society,* 85 Conn. 289, 296, 82 A. 561 (1912)." *State* v. *Russell,* 218 Conn. 273, 278, 588 A.2d 1376 (1991). Section 36-224*l* (a) (1) prohibits a lender from charging more than 10 percent of the principal amount of the loan for "any loan fees, points, commissions, *transaction fees* or similar prepaid finance charges . . . ." (Emphasis added.) The general term "transaction fees" must be construed in light of the other, more specific, terms used in the statute. These other terms—loan fees, points, commissions and prepaid finance charges—are all specific prepaid interest charges. Consistent with the principle of ejusdem generis, therefore, the closing costs—attorney's fees, appraisal fees, etc.—which are not prepaid interest charges, should not be considered when determining whether a lender has exceeded the 10 percent limit.

[32] The plaintiff claims that we should require that the lender commit an intentional violation of General Statutes § 36-224*l* to incur liability. There is, however, no intent element in the statute and we see no reason to read such a requirement into it.

with respect to the May, 1988 loan transaction.[33] Having concluded that the plaintiff violated § 36-224*l* (a), we remand the issue of the defendants' remedies to the trial court.[34]

## IV

The defendants' final claim is that the plaintiff violated the Connecticut Unfair Trade Practices Act (CUTPA); see footnote 5, supra; because of: (1) the unconscionability of the mortgage loan transactions; (2) the plaintiff's violation of General Statutes § 36-224*l*; and (3) the plaintiff's violation of the federal Truth in Lending Act (TILA). We agree that the plaintiff's violation of § 36-224*l* and TILA constituted a violation of CUTPA.[35]

It is well settled that in determining whether a practice violates CUTPA we have "adopted the criteria set out in the 'cigarette rule' by the federal trade commission for determining when a practice is unfair: '(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public

[33] The defendants do not claim that the plaintiff violated General Statutes § 36-224*l* with respect to the November, 1987 loan transaction.

[34] We note that General Statutes § 36-224*l* (b) provides in relevant part that "[a]ny lender who fails to comply with the provisions of this section shall be liable to the borrower in an amount equal to the sum of: (1) The amount by which the total of all loan fees, points, commissions, transaction fees, other prepaid finance charges, and broker's fees and commissions exceeds ten per cent of the principal amount of the loan; (2) ten per cent of the principal amount of the loan or two thousand five hundred dollars, whichever is less; and (3) the costs incurred by the borrower in bringing an action under this section, including reasonable attorney's fees, as determined by the court . . . ." This subsection, however, was added in 1990 by Public Acts 1990, No. 90-184, and, therefore, was not in effect at the time of the May, 1988 loan transaction. We leave the issue of whether this subsection should be applied retroactively to the trial court.

[35] Because we have concluded, in part I of the opinion, that the mortgage loan transactions were not unconscionable, we need not consider whether a successful unconscionability claim would also constitute a violation of CUTPA.

policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen].' *Conaway* v. *Prestia,* [191 Conn. 484, 492–93, 464 A.2d 847 (1983)], quoting *FTC* v. *Sperry & Hutchinson Co.,* 405 U.S. 233, 244–45 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972) [*Sperry*] . . . ." *McLaughlin Ford, Inc.* v. *Ford Motor Co.,* 192 Conn. 558, 567–68, 473 A.2d 1185 (1984).

"All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. Statement of Basis and Purpose, Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, 43 Fed. Reg. 59,614, [and] 59,635 (1978)." (Internal quotation marks omitted.) Id., 569 n.15. "Thus a violation of CUTPA may be established by showing either an actual deceptive practice; see, e.g., *Sprayfoam, Inc.* v. *Durant's Rental Centers, Inc.,* 39 Conn. Sup. 78, 468 A.2d 951 (1983); or a practice amounting to a violation of public policy. See, e.g., *Sportsmen's Boating Corporation* v. *Hensley,* [192 Conn. 747, 474 A.2d 780 (1984)]." *Web Press Services Corporation* v. *New London Motors, Inc.,* 203 Conn. 342, 355, 525 A.2d 57 (1987). Furthermore, a party need not prove an intent to deceive to prevail under CUTPA. See id., 363 (knowledge of falsity, either constructive or actual, need not be proven to establish CUTPA violation).[36]

---

[36] In *Web Press Services Corporation* v. *New London Motors, Inc.,* 203 Conn. 342, 362–63, 525 A.2d 57 (1987), we noted: "[I]n deciding whether a particular practice is unfair or deceptive under our statutes the legisla-

The first criterion of the *Sperry* rule requires us to consider whether the unfair practice alleged, in the present case, a violation of § 36-224*l* and TILA, offends public policy to the extent that it constitutes a breach of established concepts of fairness. *Web Press Services Corporation* v. *New London Motors, Inc.*, supra, 355. We conclude that the plaintiff's violations of both statutes amount to such a breach. This conclusion is bolstered by the fact that the plaintiff violated two different statutes, each implementing different public policies and effectuating those policies through different legislative means. An examination of each statute's public policies, and means of effectuating those policies, is necessary.

The primary public policy underlying TILA is to promote "the informed use of consumer credit." 12 C.F.R. § 226.1 (b). Title 15 of the United States Code, § 1601 (a) states in relevant part that "the purpose of [TILA is] to *assure a meaningful disclosure of credit terms* so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." (Emphasis added.) The House of Representatives report accompanying TILA

ture has indicated that 'the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. 45 (a) (1)) . . . .' General Statutes § 42-110b (b). The United States District Court for the District of Connecticut has determined that for a representation to be unlawfully deceptive, it is not necessary that the seller intended to deceive. *Bailey Employment System, Inc.* v. *Hahn,* [545 F. Sup. 62, 67 (D. Conn. 1982), aff'd, 723 F.2d 895 (2d Cir. 1983)]; see also *Porter & Dietsch, Inc.* v. *F.T.C.,* 605 F.2d 294, 308–309 (7th Cir. 1979). In keeping with the remedial purpose of the federal Unfair Trade Practices Act, other courts and commentators have interpreted the act not to require proof that the actor or declarant knew of the falsity of his statement or act. See generally D. Ormstedt & R. Langer, 'The Connecticut Unfair Trade Practices Act,' 52 Conn. B. J. 116, 124 (1978), and authorities cited therein."

provides that "[y]our committee believes that . . . *the credit disclosure features of [TILA] . . . [are] fundamental to its legislative purpose.* This aspect of the bill is designed to provide consumers with basic information in connection with their credit transactions so that they may effectively 'comparison shop' for credit in order to obtain credit on the most favorable terms available in the market place." (Emphasis added.) H. Rep. No. 1040, 90th Cong., 1st Sess. 18, reprinted in 1968 U.S. Code Cong. & Admin. News 1975. Thus, TILA seeks to effectuate its public policy of promoting the informed use of credit by requiring lenders to disclose credit terms to consumers.

By promoting the informed use of credit, TILA also seeks to increase competition and to protect consumers from unfair practices. For example, 15 U.S.C. § 1601 (a) states that TILA was enacted because "Congress [found] that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit."[37] The House of Representatives report further provides that "[f]or the relatively unsophisticated consumer, particularly those of modest means, [TILA] . . . will provide their only protection against unscrupulous merchants or lenders. . . . These provisions not only will protect the consumer, but will further protect the honest businessman from unethi-

---

[37] The House of Representatives report accompanying TILA further noted how important the use of credit had become in the United States: "Consumer credit has become an essential feature of the American way of life. It permits families with secure and growing incomes to plan ahead and to enjoy fully and promptly the ownership of automobiles and modern household appliances. It finances higher education for many who otherwise could not afford it. To families struck by serious illness or other financial setbacks, the opportunity to borrow eases the burden by spreading the payments over time." H. Rep. No. 1040, 90th Cong., 1st Sess. 8–9, reprinted in 1968 U.S. Code Cong. & Admin. News 1965.

cal forms of competition engaged in by some unscrupulous creditors who prey upon the poor through deceptive credit practices." H. Rep. No. 1040, 90th Cong., 1st Sess. 18, reprinted in 1968 U.S. Code Cong. & Admin. News 1975–76.

TILA does not, however, seek to effectuate its public policies by imposing a cap on any credit terms. "[T]he truth in lending and credit advertising title, neither regulates the credit industry, nor does it impose ceilings on credit charges. It provides for full disclosure of credit charges, rather than regulation of the terms and conditions under which credit may be extended. It is the view of your committee that such full disclosure would aid the consumer in deciding for himself the reasonableness of the credit charges imposed and further permit the consumer to 'comparison shop' for credit. It is your committee's view that full disclosure of the terms and conditions of credit charges will encourage a wiser and more judicious use of consumer credit." H. Rep. No. 1040, 90th Cong., 1st Sess. 7, reprinted in 1968 U.S. Code Cong. & Admin. News 1963.

The primary public policy underlying § 36-224*l* is to protect consumers of credit regardless of whether they are informed of the credit terms. This statute is particularly aimed at those consumers who will pay an exorbitant prepaid finance charge because they desperately require credit. In hearings before the Banking Joint Standing Committee, the then department of banking commissioner Brian J. Woolf[38] stated: "Unfortunately the individual [credit consumers are] in a posi-

---

[38] "Although we generally restrict our review of a statute's legislative history to the discussions conducted on the floor of the House of Representatives or of the Senate, we will consider such committee hearing testimony of individuals addressing the proposed enactment when such testimony provides particular illumination for subsequent actions on proposed bills, such as in this instance. See *In re Jessica M.*, 217 Conn. 459,

tion in which they . . . desperately [need] . . . funds and when one desperately needs funds they are willing to pay—take out a loan for $10,000, a loan that's only going to [give them] $6,000 after they have paid the upfront fees . . . ." Conn. Joint Standing Committee Hearings, Banks, 1983 Sess., p. 29. Woolf further stated that "there does come a point in time where . . . a person . . . of this kind who is desperate in the need of funds should have some type of protection and I think that there is a . . . time when a government . . . [sees] gross abuses, I think that it's time the government should—step in and say, well, the limit has been reached and therefore some type of protection is necessary for the . . . [consumer]." Conn. Joint Standing Committee Hearings, Banks, 1983 Sess., p. 31. "I think the best approach would be to limit . . . [the] upfront points that any second mortgage lender can charge to a—to a borrower." Id., p. 26.

Section 36-224*l*, thus, effectuates its public policy through different legislative means than does TILA. Rather than requiring a lender to disclose the prepaid finance charge to the consumer of credit, § 36-224*l* requires that a lender cannot charge a prepaid finance charge that exceeds 10 percent of the principal amount of the loan. Thus, while TILA seeks to promote the informed use of consumer credit by requiring lenders to disclose credit terms, § 36-224*l* seeks to protect credit consumers, particularly those who desperately require credit and whose choice of creditors is limited, by limiting the prepaid finance charge that a lender can charge to a borrower.

472 n.10, 586 A.2d 597 (1991); see also *State* v. *Magnano,* 204 Conn. 259, 273–74 n.8, 528 A.2d 760 (1987) . . . ." *Elections Review Committee of Eighth Utilities District* v. *Freedom of Information Commission,* 219 Conn. 685, 695 n.10, 595 A.2d 313 (1991); see also *North Haven* v. *Planning & Zoning Commission,* 220 Conn. 556, 564 n.11, 600 A.2d 1004 (1991).

Section 36-224*l* also seeks to protect a more narrow class of consumers, namely, consumers of credit in the secondary mortgage market. Second mortgage businesses often aggressively advertise the ease with which a consumer can obtain credit. Furthermore, such advertisements are often aimed at unsophisticated and desperate consumers. In hearings before the Joint Standing Committee on Banks, in response to questions by various Senators and Representatives, Raphael Podolsky, a representative from the Legal Services Training and Advocacy Project, stated that "[t]his is not a competitive market in kind of a classic economic sense. You have to remember that unlike say [Connecticut Bank and Trust Company], which does not go out and aggressively push in second mortgage loans. This is an industry in which people go out and try and sell you a loan. They may contact you at your house. They may make aggressive use of advertising. Unless the customer is fairly sophisticated and understands that they could go shopping at a bank and maybe get a better deal, they very often don't know that there are alternative ways of financing plus they tend to be upgraded."[39] Conn. Joint Standing Committee Hearings, Banks, 1983 Sess., p. 101.

---

[39] Raphael Podolsky further explained: "Well the reason is that very often these are people who are not looking for a loan to start with. In other words, this is not somebody who says, yeah I need a loan to do an improvement on my home, I'm going to get my money. These are people who by one means or another, [are] contacted by the lender. It's in some instances almost a nature of a door-to-door salesman, I don't mean to say it's a door-to-door sale, but it's the aggressive use of advertising [that] makes people think that's where you're supposed to go to get them and combined with the fact that the points obscure the interest rates, people often start moving into this kind of a contract without a very clear understanding of the real interest rates." Conn. Joint Standing Committee Hearings, Banks, 1983 Sess., p. 102.

He further stated: "I don't mean in the sense of solicitors going to the house, I mean in the sense of mailings, in the sense of television advertising, the sense of advertising the classified sections of the paper, easy money, no credit references required, no credit history taken and I didn't bring

In light of the foregoing, it is clear that § 36-224*l* and TILA both express equally strong, yet different, public policies of informing and protecting consumers of credit. We conclude, therefore, that the plaintiff's violations of both statutes offend public policy so as to amount to an established concept of unfairness.[40]

Turning to the second criterion of the *Sperry* rule, we must consider whether the plaintiff's violation of TILA and § 36-224*l* was "immoral, unethical, oppressive, or unscrupulous." Our consideration of this criterion is guided by the factual findings of the trial court. The court found that "the actions of the plaintiff were not unfair or deceptive in the conduct of its business nor were they immoral or unethical or oppressive or unscrupulous . . . ." Since the record does not reflect any intent by the plaintiff to deceive the defendants, we conclude that these factual findings are not clearly erroneous. We therefore conclude that the second criterion of the *Sperry* rule has not been satisfied in this case. We note, however, that " '[a]ll three criteria do not need to be satisfied to support a finding of unfairness. . . .' " *McLaughlin Ford, Inc.* v. *Ford Motor Co.,* supra, 569 n.15. Therefore, we turn to the third criterion of the *Sperry* rule.

The third criterion requires us to consider whether the plaintiff's violation of TILA and § 36-224*l* caused substantial injury to the defendants. In considering this criterion, the Federal Trade Commission has stated:

that with me but if you look in the classified section of say the Hartford Courant, you'll see some of those and they're designed to appeal precisely to people who are not sophisticated and who are not in the market, who are not regularly going from bank to bank to see what they can get." Id., p. 104.

[40] In support of our conclusion that a violation of TILA offends a strong public policy, we note that any violation of TILA, no matter how technical, results in the imposition of liability. See *Grant* v. *Imperial Motors,* 539 F.2d 506, 510 (5th Cir. 1976); see also *Kadlec Motors, Inc.* v. *Knudson,* 383 N.W.2d 342 (Minn. App. 1986).

" 'The independent nature of the consumer injury criterion does not mean that every consumer injury is legally "unfair," however. To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.' " *McLaughlin Ford, Inc.* v. *Ford Motor Co.,* supra, 569–70, quoting letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980) (reprinted in Averitt, "The Meaning of 'Unfair Acts or Practices' in § 5 of the Federal Trade Commission Act," 70 Geo. L.J. 225, 291 [1981]). We conclude that, in the present case, the plaintiff's violation of TILA and § 36-224*l* did cause the defendants substantial injury. We cannot conclude that the plaintiff's TILA violation, by itself, in failing accurately to disclose and include $55 in the prepaid finance charge, caused the defendants a substantial injury. This TILA violation, however, coupled with the plaintiff's violation of § 36-224*l* did cause the defendants a substantial injury since they were charged a prepaid finance charge of $490; see footnote 30, supra; or a full percentage point above the maximum 10 percent of the principal amount of the loan that a lender may charge to a borrower pursuant to § 36-224*l*.

On the the basis of the foregoing considerations, we conclude that the plaintiff's violations of TILA and § 36-224*l* did cause substantial injury to the defendants. Although the second criterion of the *Sperry* rule has not been met, the degree to which the other two criteria have been met leads us to conclude that the plaintiff's violation of TILA and § 36-224*l* was an unfair trade practice in violation of CUTPA. See *McLaughlin Ford, Inc.* v. *Ford Motor Co.,* supra, 569 n.15. This conclusion is particularly appropriate since CUTPA's "cover-

age is broad and its purpose remedial. *Hinchliffe* v. *American Motors Corporation,* 184 Conn. 607, 616, 440 A.2d 810 (1981)." Id., 566.

Having concluded that a violation of either § 36-224*l* or TILA may constitute a violation of CUTPA, we next turn to the defendants' remedies under CUTPA. General Statutes § 42-110g[41] provides the remedy for a

[41] General Statutes § 42-110g provides: "ACTION FOR DAMAGES. CLASS ACTIONS. COSTS AND FEES. EQUITABLE RELIEF. (a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. Proof of public interest or public injury shall not be required in any action brought under this section. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper.

"(b) Persons entitled to bring an action under subsection (a) of this section may, pursuant to rules established by the judges of the superior court, bring a class action on behalf of themselves and other persons similarly situated who are residents of this state or injured in this state to recover damages.

"(c) Upon commencement of any action brought under subsection (a) of this section, the plaintiff shall mail a copy of the complaint to the attorney general and, upon entry of any judgment or decree in the action, shall mail a copy of such judgment or decree to the attorney general.

"(d) In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery. In a class action in which there is no monetary recovery, but other relief is granted on behalf of a class, the court may award, to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorneys' fees. In any action brought under this section, the court may, in its discretion, order, in addition to damages or in lieu of damages, injunctive or other equitable relief.

"(e) Any final order issued by the department of consumer protection and any permanent injunction, final judgment or final order of the court made under section 42-110d, 42-110m, 42-110o or 42-110p shall be prima facie evidence in an action brought under this section that the respondent or defendant used or employed a method, act or practice prohibited by section 42-110b, provided this section shall not apply to consent orders or judgments entered before any testimony has been taken.

"(f) An action under this section may not be brought more than three years after the occurrence of a violation of this chapter."

CUTPA violation and states in subsection (a) that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, [see footnote 5, supra,] may . . . recover actual damages."[42] Subsection (d) further provides for recovery of costs, reasonable attorney's fees and injunctive or other equitable relief. See footnote 41, supra. These elements of relief will have to be determined on the remand.

In their special defenses and counterclaims, the defendants pleaded that the plaintiff's mortgage was unenforceable. As noted above, the issues of remedies flowing from those defenses and counterclaims were not considered by the trial court or briefed in this court. Accordingly, we have, with respect to the defendants' special defenses and counterclaims based upon TILA, CUTPA and § 36-224$l$, left the issues of the appropriate remedies therefor to the trial court upon the remand.

If the trial court concludes that any such remedy justifies withholding enforcement of the plaintiff's mortgage, the judgment on the plaintiff's complaint must be reversed. If, however, the trial court does not conclude that any such remedy justifies withholding enforcement of the plaintiff's mortgage, the judgment on the plaintiff's complaint must be affirmed and new law days set. We therefore reverse the judgment of foreclosure on the plaintiff's complaint in order to permit the trial court on the remand to consider the issue of the effect, if any, on the judgment of foreclosure of the remedies flowing from the plaintiff's violation of TILA, CUTPA and § 36-224$l$.

---

[42] General Statutes § 42-110g (a) also provides that "the court may, in its discretion, award punitive damages . . . ." The parties have not addressed, and we do not decide, whether the facts of this case would justify such an award.

With respect to the judgment on the defendants' counterclaims based upon TILA, CUTPA and § 36-224*l*, the judgment of the trial court is reversed, and the remedies are to be determined upon the remand.

The judgment is reversed and the case is remanded for further proceedings in accordance with this opinion.

In this opinion SHEA, CALLAHAN and GLASS, Js., concurred.

BERDON, J., dissenting in part and concurring in part. We sit as a court of equity in reviewing this appeal from the granting of foreclosure of the defendants' property. See *Reynolds* v. *Ramos,* 188 Conn. 316, 320, 449 A.2d 182 (1982). A long standing equitable principle requires that "[e]quity will not afford its aid to one who by his conduct or neglect has put the other party in a situation in which it would be inequitable to place him [or her]." *Glotzer* v. *Keyes,* 125 Conn. 227, 231–32, 5 A.2d 1 (1939). Simply put, "[e]quitable power must be exercised equitably." *Hamm* v. *Taylor,* 180 Conn. 491, 497, 429 A.2d 946 (1980). Since I believe that the cumulative effect of the two loans made by the plaintiff and secured by the mortgages (second mortgage I and II) is unconscionable under established principles of equity, I would not enforce the terms of the note secured by second mortgage II according to its tenor. Id.

Instead, the majority allows the equitable powers of this court to be used to the advantage of the plaintiff mortgagee, Cheshire Mortgage Service, Inc., a sophisticated money lender, in the foreclosure of a mortgage on the property of the defendant mortgagors, Luis Montes and Dalila Montes. The defendants are uneducated Hispanic persons who are far from fluent in the English language,[1] and who were not represented by

---

[1] One defendant could not read any English and the other a "little bit."

counsel. Compounding these problems, the closing attorney for the plaintiff chose to conduct the closing for second mortgage II out of his vehicle at the parking lot of a restaurant in Branford.

In the often cited case of *Williams* v. *Walker-Thomas Furniture Co.*, 350 F.2d 445, 449–50 (D.C. Cir. 1965), the Court of Appeals for the District of Columbia held that "[u]nconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power. The manner in which the contract was entered is also relevant to this consideration. Did each party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive . . . practices? Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his [or her] consent, or even an objective manifestation of his [or her] consent, was ever given to all the terms. In such a case the usual rule that the terms of the agreement are not to be questioned should be abandoned and the court should consider whether the terms of the contract are so unfair that enforcement should be withheld."

In the present case, the loan transactions began with a contractor's attempt to finance the sale of vinyl sid-

ing to the defendants for their home through the Tolland Bank and now ends in this foreclosure action in which they may lose their home. Unable to obtain conventional financing at the bank for the siding, the contractor took the defendants' application that was originally completed for the Tolland Bank "down the line" into the hands of the plaintiff. The defendants then completed the two loan transactions with the plaintiff.

At the time of entering into the loans, the defendant Luis Montes, who had previously suffered a heart attack, was afflicted with a kidney disease that necessitated dialysis treatment, which left him permanently disabled and unable to work. The defendants had a total monthly income of $1195, including Luis Montes' social security disability benefits. The trial referee found that the defendants "were not neophytes in the financial world," but this finding is not supported by the evidence. The trial referee predicated his finding on the fact that when the defendants originally purchased their home for $25,000, it was financed by a first mortgage of $23,700 from People's Bank that provided for monthly payments of $407, including property taxes. The defendants' participation in one legitimate transaction with People's Bank, however, does not support the trial referee's conclusion that they had the sophistication to understand fully the present transactions and the financial implications.

Under the terms of second mortgage II, plus the seven monthly payments previously made under second mortgage I, the defendants would have been required to pay principal, bonus points,[2] interest, attorney's fees, and other associated costs totaling $70,486.61[3] for less

---

[2] Bonus points are referred to in the majority opinion as the "prepaid finance charge."

[3] The payments that had been made under second mortgage I, and the payments that were to be made under second mortgage II under the terms of the loan transaction were as follows:

than four years of financing. In return, they only received benefits in cash, payment to other creditors and the vinyl siding, totaling $32,328.62.[4] The result is a net cost of $38,157.99 to the defendants for approximately forty-two months of financing. Equalizing these costs of $38,157.99 over that period (seven months under second mortgage I and thirty-five months under second mortgage II), the cost of the net actual economic benefits of $32,328.62 was $908.52 per month. This amounts to a shocking 33.7 percent per annum costs for the financing, which the plaintiff conceded was fully secured.[5] Furthermore, when second mortgage II was entered into the defendants received an additional benefit of only $10,897.95 (cash of $9628.62 and credit life insurance of $1251.33), for which they not only had to pay interest but also bonus points of $4350 which, put in percentage terms, was a bonus of approximately 40 percent. Although the exorbitant rates on a fully secured loan, under the circumstances of this case, do not shock the conscience of the majority, they do mine.[6]

| | |
|---|---|
| Seven monthly payments of $399.38 under second mortgage I | $2795.66 |
| Amount to pay off balance of note secured by second mortgage I | 27,070.05 |
| Closing costs for second mortgage II | 2451.33 |
| Bonus points on second mortgage II | 4350.00 |
| Cash to the defendants | 9628.62 |
| | 46,295.66 |
| Thirty-five monthly payments of $691.17 | 24,190.95 |
| | $70,486.61 |

[4] The actual cash and economic benefits derived from the two loan transactions under second mortgage I and II are as follows:

| | |
|---|---|
| Vinyl siding | $9902.00 |
| Prior debts paid | 12,671.31 |
| Cash from second mortgage I | 126.69 |
| Cash from second mortgage II | 9628.62 |
| | $32,328.62 |

[5] As a result of substantial payments taken out in advance, the effective rate of interest is higher.

[6] A question of unconscionability is a matter of law; *Texaco, Inc.* v. *Golart,* 206 Conn. 454, 461, 538 A.2d 1017 (1988); and, as the majority points outs, it "is subject to a plenary review on appeal."

The defendants' case, however, does not stop there. Equally problematic is that the defendants could never repay either one of the loans that had been secured by the mortgages. Second mortgage I required monthly payments of $806.38 ($407 for the first mortgage and taxes and $399.38 for second mortgage I) from the defendants' monthly income of $1195, which amounts to 67 percent of their total income. How could they be expected to live on the balance of $388.62, that is— pay for utilities, heat, food, clothing and other necessities, plus any payroll deductions?

Second mortgage II called for outrageous payments of $1098.17 per month ($407 for the first mortgage and taxes and $691.17 for second mortgage II) or a whopping 92 percent of the defendants' gross monthly income. The majority speculates that the defendants had additional income because they were able to live and pay second mortgage I for seven months. When this speculation is applied to second mortgage II, it is obvious that the monthly payments were outrageous because the defendants were unable to make a single payment.

Furthermore, the defendants could never be expected to pay the balloon payments—the lump sum payment due at the end of the term of the loan—on second mortgage I in the amount of $26,810.61 and on second mortgage II in the amount of $44,075.03, both of which were in excess of the original principal amounts of the notes secured by the mortgages.[7] As the court in *Campbell Soup Co.* v. *Wentz,* 172 F.2d 80, 84 (3d Cir. 1948), stated, the "sum total of its provisions drives too hard a bargain for a court of conscience to assist."

---

[7] The note secured by second mortgage I was $26,500, and the note secured by second mortgage II was $43,500. This reminds me of the days of the "company store" that extended credit on a basis that never allowed the employee customer to become debt free.

To justify its finding that the loans were not unconscionable, the trial referee and the majority rely on the plaintiff's claim that it was told that the defendant Luis Montes had some additional income, not shown on the application. There is no evidence to support such a finding. The plaintiff's president, Richard Coppola, was unable to testify as to the dollar amount of this additional income, there was no documentary evidence to support this claim and there was not even a note in the corporation's records to verify that he was so advised.[8]

---

[8] The cross-examination of Richard Coppola, president of Cheshire Mortgage Service, Inc., by the defendants' attorney, David Welch-Rubin, revealed the following:

"[Attorney David Welch-Rubin:] In your file, do you have any other records regarding the income of Mr. and Mrs. Montes, either prior to the November, '87, or prior to the May, '88 mortgage?

"[Richard Coppola:] No.

"Q. You received no other documentation?

"A. Documentation, no. It was verbal. I was told that Mr. Montes had some additional income. It was an undisclosed source.

"Q. Who reported that to you?

"A. It was verbalized to us that Mr. Montes had some additional income, both by the home improvement contractor and by the Monteses when we first made initial contact with them.

"Q. Who verbalized that to you? What persons?

"A. The contractor.

"Q. What was his name?

"A. Which would have been Mr. Szyak of Tech Energy, and I believe it was Mrs. Montes. We received the information and started working on the application.

"Q. What was the amount of additional income?

"A. When this loan was made, this was the no-income verification loan program.

"Q. What was the original amount of the income that you're saying you were told Mr. Montes—

"A. I have nothing in the file to give me an exact amount.

"Q. So you have no information as to any claimed additional income?

"A. It was represented to be a substantial amount, or we certainly wouldn't have made the loan.

"The Court: What was the source?

"The Witness: Mr. Montes was apparently in some sort of trade, I don't know whether he was doing some painting work, or carpentry work, or something of that nature.

"The Court: This came from Mrs. Montes is what you're saying?

"It does not seem too much to say that one who voluntarily extends credit by disregarding a known risk, or risks which could be discovered by a reasonable effort, should bear the loss when loss occurs. If such a standard imposes some brake on the credit boom, it would be a brake wisely applied in the interests of both the consumers and the extenders of credit." V. Countryman, "Improvident Credit Extension: A New Legal Concept Aborning?" 27 Mex. L. Rev. 1, 23 (1975).

It is clear to me that the defendants could neither pay the monthly payments nor pay the balloon payment at the end of the term of the loan. Indeed, the loan secured by second mortgage II was made solely on the

"The Witness: Right.

"BY MR. WELCH-RUBIN:

"Q. On the Tolland Bank application, what was listed as the source of Luis Montes's income?

"A. Social Security—no, that's the wife. Social Security, yes, that's it.

"Q. Social Security, and the amount is how much?

"A. It shows here $475.

"Q. What was the wife's income listed as?

"A. $640.00.

"Q. A month?

"A. Yes.

"Q. For a total of $1,125 a month?

"A. Yes.

"The Court: The exhibit speaks for itself. Is there any other income other than Social Security on there?

"The Witness: Not listed on the application, no.

"BY MR. WELCH-RUBIN:

"Q. And it was your valuation that out of that listed income and some unknown amount of additional income they had, you thought they had, they could pay a $407.00 first mortgage plus an additional $399 and change to you on the November, '87 mortgage, so over $800 a month in mortgage payments alone?

"A. Yes.

"Q. Out of approximately $1,100 in gross income?

"A. No, not $1,100 in gross income. We thought there was more and that is the reason we put them in the low income verification program.

"Q. You didn't need any verification of the amount that was more?

"A. No, it was unnecessary. If they felt they could make the payments, it would have been the only reason they could have borrowed the money."

basis of the equity that the defendants had in the house. "Many financial experts refer to such mortgage companies as 'equity skimmers' because the loans are based not on a person's ability to repay them, but on the amount of equity in their home. They charge that the companies make these loans with the intention of foreclosing upon the homeowner and reaping a profit through the equity in the home." J. Morris, "Borrowers Beware," Manchester, New Hampshire, Sunday News, Feb. 4, 1990, p. A-7.[9] The evidence indicated that at the time of the foreclosure the house had a value of $90,000. The possible practice of equity skimming under the circumstances of this case is unconscionable and this court should hold as much.

The defendants concede that they are not entirely without blame; any credit extension that is improvident on the part of the creditors is also improvident on the part of the debtor. Nevertheless, "typically the creditor is better equipped—by education, experience, resources, and the nature of his role—to avoid and distribute the risk of improvidence. Hence, as between the two blameworthy participants in the improvident credit extension, it seems . . . that in most cases the burden of loss should be placed on the improvident creditor by means of a remedy conferred on the improvident debtor." V. Countryman, supra, 17. Surely, taking into consideration the circumstances of the defendants, this is such a case. "[P]rotection must be given to those who do not have the economic sophistication or the awareness possessed by others who may be less concerned about credit; the [Connecticut Unfair Trade Practices Act (CUTPA)] must be applied to protect the unthinking, the unsuspecting and the credulous . . . .

---

[9] We may take judicial notice of this newspaper article. *Mahoney* v. *Lensink,* 213 Conn. 548, 562 n.20, 569 A.2d 518 (1990); *Moore* v. *Moore,* 173 Conn. 120, 123 n.1, 376 A.2d 1085 (1977).

*Exposition Press, Inc.* v. *Federal Trade Commission,* 295 F.2d 869, 872 (2d Cir. [1961]), cert. denied, 370 U.S. 917 [82 S. Ct. 1554, 8 L. Ed. 2d 497 (1962)]; *Progress Tailoring Co.* v. *Federal Trade Commission,* 153 F.2d 103, 105 (7th Cir. [1946]); *Aronberg* v. *Federal Trade Commission,* 132 F.2d 165, 167 (7th Cir. [1942])." *Murphy* v. *McNamara,* 36 Conn. Sup. 183, 190, 416 A.2d 170 (1979).

The majority treats this case just as it would a transaction between commercial parties. It relies on such cases as *Texaco, Inc.* v. *Golart,* 206 Conn. 454, 538 A.2d 1017 (1988) (commercial property); *Hamm* v. *Taylor,* supra (mortgage on a roadside tavern); *Edart Truck Rental Corporation* v. *B. Swirsky & Co.,* 23 Conn. App. 137, 579 A.2d 133 (1990) (rental of truck for paper recycling business); *Iamartino* v. *Avallone,* 2 Conn. App. 119, 122, 477 A.2d 124, cert. denied, 194 Conn. 802, 478 A.2d 1025 (1980) (residential property wherein mortgagee was contractor, involved in home improvement business and owned a variety of property, including a shopping center).

Instead of reviewing this case through the lens of commercially savvy parties, we must determine whether the loans were unconscionable on the basis of a transaction between a professional mortgage lender and unsophisticated credit consumers who had a total monthly income below the poverty level. Paraphrasing the language of the United States Supreme Court in *Hume* v. *United States,* 132 U.S. 406, 411, 10 S. Ct. 134, 33 L. Ed. 393 (1889), unconscionability is defined as a transaction that no person in his or her senses and not under delusion would make on the one hand and no honest and fair person would accept on the other. The New York courts have applied the doctrine of unconscionability as follows: "In *Frostifresh Corp.* v. *Reynoso,* [52 Misc. 2d 26, 27, 274 N.Y.S.2d 757 (1966), rev'd on other grounds, 54 Misc. 2d 119, 281 N.Y.S.2d

964 (1967)], the court refused to enforce a contract where the Spanish speaking customers had signed an installment contract for a refrigerator, and agreed to pay $1,145.88 for a refrigerator worth $348. The court held that the [d]efendants were handicapped by a lack of knowledge, both as to the commercial situation and the nature and terms of the contract which was submitted in a language foreign to them. The same situation invalidated a contract in *Jones* v. *Star Credit Corp.,* [59 Misc. 2d 189, 298 N.Y.S.2d 264 (1969)]. The court there stated its concern for the uneducated and often illiterate individuals who are the victims of the gross inequality of bargaining power and the overreaching by merchants who would take advantage of their ignorance." (Internal quotation marks omitted.) *Blake* v. *Biscardi,* 62 App. Div. 2d 975, 976–77, 403 N.Y.S.2d 544 (1978); see also *Community Acceptance Corporation of Denham Springs, Inc.* v. *Kinchen,* 417 So. 2d 22 (La. App. 1982) (unconscionable promissory note made between a finance and loan company and three individuals). Applying this standard, I conclude that the cumulative effect of both loan transactions was unconscionable.

Accordingly, I would reverse on this issue and remand the case to the trial court with direction to reduce the finance charges and other associated costs on the loan secured by second mortgage II in order to reflect the legal rate of interest. General Statutes § 37-1 (a). I also disagree with part IV of the majority decision which holds that there was no violation of CUTPA as a result of the loan transaction being unconscionable.

I write separately on Part II because I am not certain what the majority means by an "effective" rescission. If the trial court finds that the defendants gave notice of the rescission in accordance with 15 U.S.C. § 1635 (b), which no one disputes, then the defendants were not required to return the consideration to the

plaintiff as a condition of the rescission. Section 1635 states the following: "(b) When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it." Only when the creditor fulfills these obligations, is the obligor required to "tender the property to the creditor." 15 U.S.C. § 1635 (b). Furthermore, to the extent that the remand of the majority could be interpreted to give the trial court discretion to determine whether the plaintiff is entitled to a foreclosure if there was a rescission, I disagree. Under the circumstances of this case, the rescission would void the mortgage and there can be no remedy of foreclosure.

I concur with the majority opinion insofar as it holds in part II that the plaintiff violated the federal Truth in Lending Act, in part III that the plaintiff violated General Statutes § 36-224*l* and in part IV that there were other unfair trade practices.

Accordingly, I dissent in part and concur in part.