[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter was commenced by the plaintiff's complaint dated June 29, 1993. The defendant filed an answer and two special defenses dated February 16, 1994. The plaintiff filed a reply to the defendant's special defenses dated February 17, 1994. The plaintiff is Booker Johnson and the defendant is Quik Lube, Inc., dba Maturo Motors. This suit was brought under Connecticut's Unfair Trade Practices Act (CUTPA) set forth in Connecticut General Statute § 42-110b, et seq. The plaintiff alleges that the defendant's actions in this matter constitute unfair and/or deceptive acts and/or practices within the aforementioned statutes.
The plaintiff purchased a 1984 Ford F-250 truck from the defendant on June 20, 1992 for $4700.00, plus sales tax of $282.00 for a total price of $4,982.00 (Exhibit A). The vehicle was purchased in an "AS IS" condition. That fact is clearly set forth in the written contract between the parties and is admitted by the plaintiff. At the time of purchase, the vehicle had been driven 81,588 miles.
The plaintiff testified that prior to the date of his purchase, he owned and managed a realty maintenance and office cleaning business for about eight years. The plaintiff testified further that he needed the vehicle for his maintenance business and, also, hoped to use it in a snow removal business that he intended to begin during the winter months.
At the time of purchase, the defendant agreed, pursuant to the written contract, to make the following repairs to the vehicle:
Repair manifold
Replace Dome Cover Gasket
Replace tire rod end
Service and safety check
Fix floor in the cab CT Page 6444
The plaintiff testified that the defendant also agreed to repair the hose connections to the plow but that this repair was not put in the contract. The defendant made all of the aforementioned repairs except for the repairs in the floor of the cab of the truck.
The plaintiff testified that in October 1992 he put the brakes on in the vehicle and that, subsequent to that, the vehicle would not move. The plaintiff then had the vehicle towed to the defendant's garage, where a mechanic replaced the vehicle's timing chain. The cost for that repair was $574.68, which the plaintiff paid (Exhibit C). These repairs were done on October 29, 1992, when the vehicle's speedometer reading was 84,859 miles. At that time the defendant also added two gallons of antifreeze and replaced the dome cover gaskets. The plaintiff testified that he had to put in more antifreeze when he took the vehicle home. The owner of the defendant corporation, Philip Maturo, testified that, when the timing chain was replaced, he called the plaintiff and recommended that he also replace the water pump because it was old and the engine was apart. Mr. Maturo stated that the plaintiff did not authorize the water pump repair at that time.
On November 27, 1992, the defendant had to replace the water pump in said vehicle for which the plaintiff paid $197.85 (Exhibit D). The speedometer reading at that time was 85,790 miles. The plaintiff testified he paid for this repair because he purchased the vehicle "AS IS."
The plaintiff then testified that he brought the vehicle back a third time to the defendant because of a problem with the lifters. The plaintiff testified that the defendant's employee recommended that he replace all of the lifters but that he did not do so because he could not afford it. He testified that he authorized the defendant to replace only those lifters that had to be replaced. The plaintiff testified that he paid a few hundred dollars for this repair and that he owed a balance to the defendant. However, he was not sure of the amount of the balance. Philip Maturo testified that he never repaired the lifters on the plaintiff's vehicle. The plaintiff did not have a bill or a receipt for the lifter job nor could he state the exact cost of the repairs to the lifters. The defendant's employee, Edmund J. Cousins, testified that he never repaired any lifters on the plaintiff's vehicle. He also stated he would never repair only CT Page 6445 some of the lifters because when you replace the lifters, it is recommended that you replace all of them.
The plaintiff testified that, in December 1992, his truck was not running properly and that it was hesitating. The oil light on the truck's dashboard went on and the plaintiff checked the oil and found it full. Within one day, the oil light was still on, so the plaintiff called Mr. Maturo and explained the problem. The plaintiff stated that Mr. Maturo told him, "it does not sound like much, bring the vehicle in when you have a chance." Shortly thereafter, while the plaintiff was using the vehicle to deliver supplies to a job site, the vehicle stopped and would not start. The plaintiff stated he called Mr. Maturo who told him to have the vehicle towed into the defendant's place of business and the plaintiff did. The plaintiff testified that, after having the vehicle examined, Mr. Maturo told him that the engine seized up because of a lack of oil and that the defendant was not responsible. The plaintiff testified that an employee of the defendant, Edmund J. Cousins, told him that, when he was making the previous repairs to the vehicle, the oil screen was not cleaned properly in that parts of gaskets from the lifters and sludge fell onto the said oil screen and blocked it up, thereby preventing any oil from reaching the engine. The plaintiff testified that he told this to Mr. Maturo who responded that that could not be the cause of the engine seizing up. At the time that the engine seized up, it had a speedometer reading of 86,150 miles. This meant that the plaintiff had driven the vehicle 4,562 miles since he purchased it on June 20, 1992. The plaintiff testified that the engine in said truck seized up about two days after the oil light originally came on.
In April 1993 the plaintiff had Auto Fair, Inc. put in a remanufactured Ford engine in the subject vehicle. The cost for this engine was $2,444.17 which the plaintiff paid. (Exhibit F.)
The plaintiff called Thomas Esposito as a witness. He was a former employee of Auto Fair, Inc. He stated that the plaintiff's vehicle came into the Auto Fair, Inc. garage from the defendant's place of business with its oil pump and oil screen missing. He stated that, when lit, the oil light indicates a lack of oil pressure. He said that, if the oil light is on and the oil dip stick registers full, then it is not appropriate to disregard the light. In that event, he said that the engine should not be run. He stated further that you should then check the oil pan and oil screen. He further stated that, if the engine's oil screen was CT Page 6446 not clean, that could cause a lack of oil pressure, which could result in the engine seizing up if the oil screen were completely plugged. He stated that he did not have an opinion as to what caused the plaintiff's truck engine to seize up because he did not have the engine parts to examine. He also stated that it was almost impossible for the lifter's gasket to end up on the oil screen. He also said that he could not say that Mr. Maturo's recommendation that the plaintiff bring the vehicle in to him as soon as possible was erroneous when the oil light went on. If the plaintiff had called him and said the oil light was on, he would have told the plaintiff to have the vehicle towed to him. He also stated a lack of antifreeze could cause the engine to seize up.
Philip Maturo, the owner of the defendant corporation, testified. He stated that, in December 1992, the plaintiff called him and said his truck would not start and that the oil light had been coming on for a day and the truck was running sluggishly. Mr. Maturo stated that he told the plaintiff to have the truck towed into his garage. The plaintiff authorized Mr. Maturo to find out why the engine would not start. Mr. Maturo stated he did this and found the engine had seized up. He then informed the plaintiff that he had to replace the engine. Mr. Maturo recommended that the plaintiff put in a remanufactured engine. The plaintiff told Mr. Maturo he would get back to him about replacing the engine. He stated that the vehicle remained in his yard until April 1993, when Auto Fair, Inc., retrieved the vehicle. Mr. Maturo insisted that the plaintiff never called him and said that the oil light was on and that the oil reading was full, and he further insisted that he never told the plaintiff to bring the vehicle into his garage at his earliest convenience. Mr. Maturo stated, "this never happened". Mr. Maturo said that, when he is told that the oil light is on, he tells the person to tow the vehicle into his garage. He said that the plaintiff did not call him until the vehicle would not operate. He stated that the plaintiff said the oil light was on for a day or so but that he had to use the truck at a job site. Mr. Maturo testified the plaintiff's truck seized up because the oil screen had sludge in it. He also said he checked his records and found no record of having repaired the vehicle's lifters for the plaintiff nor did he remember doing so. Mr. Maturo testified that he did not put the oil pump and screen with the plaintiff's vehicle because it needed a new engine anyway and, also, because he forgot about these parts when Auto Fair, Inc., retrieved the vehicle.
Edmund J. Cousins testified as a defense witness. He was CT Page 6447 employed by the defendant in 1992, and did all of the repairs to the vehicle prior to the plaintiff's buying it, including replacing the exhaust manifold. He stated that he put in the new timing chain on the plaintiff's vehicle in October 1992, and the new water pump in November 1992. He stated that, when he replaced the water pump, there was no reason to check the oil pump and screen. He said that he did not repair the lifters on the plaintiff's vehicle and that it was customary to replace all the lifters when one is replaced. He stated that in December 1992, he was told to find out what caused the engine in the plaintiff's vehicle to seize up. He stated he found that the reason the engine seized up was due to a sludge buildup on the oil screen. He testified that sludge is the result of a lack of maintenance and not replacing the oil filter often enough. Mr. Cousins stated that he never spoke to the plaintiff about why the engine seized up. He stated that he never told the plaintiff that the engine seized up because of a lack of proper repairs nor did he tell the plaintiff that the gaskets from the lifters caused the problem. He stated that it is not probable that a lifter gasket would fall to the oil screen. Mr. Esposito said the same thing. Mr. Cousins denied ever telling the plaintiff that the engine seized up because of his actions.
The plaintiff claims damages of $2,444.17 for the cost of the engine replacement (Exhibit F) and $87.75 for the rental of a vehicle (Exhibit E) when his truck was not operating. He also claims damages of $11,514.00 for the loss of snowplowing revenues from December 1992 to March 1993. Since the winter of 1992-1993 would have been his first winter in the snowplowing business he bases his losses for that winter on the revenues he earned in 1993-1994 from snowplowing. In the winter of 1993-1994 the plaintiff earned $11,514.00 in snowplowing revenues (Exhibit G). Thus, the plaintiff is claiming a total of $14,045.92 out-of-pocket damages, plus attorney's fees, punitive damages, cost of suit and interest on any judgment rendered under CUTPA.
The plaintiff asserts that the trial court should conclude that the defendant's conduct constituted a violation of CUTPA. In essence, he maintains that the defendant's sale of the 1984 Ford F-250 truck was an unfair trade practice that offended public policy. This court agrees. It is well settled that in determining whether [an act or] practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when [an act or] practice is unfair: (1) [W]hether the practice, without necessarily having been CT Page 6448 previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen]. (Citations omitted) Jacobs v. Healey Ford-Subaru, Inc.,231 Conn. 707, 725 (1995). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. Ibid. Thus, a violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. Id. Furthermore, a party need not prove an intent to deceive to prevail under CUTPA. Id.
The court will now examine the aforementioned three criteria to determine if the plaintiff has proven a CUTPA violation. The first criteria of the rule requires the court to consider whether the unfair practice alleged in the present case offends public policy to the extent that it constitutes a breach of established concepts of fairness. Cheshire Mortgage Service, Inc. v. Montes,223 Conn. 80, 107 (1992). The court concludes that the sale of the subject vehicle in this case amounts to such a breach.
The vehicle was only driven 4,562 miles from the date of its purchase to the date the engine seized up. The court finds that the plaintiff did not abuse said vehicle while he owned it and that the engine in said vehicle did not seize up due to any act of the plaintiff. Public policy dictates that a person has a right to expect a vehicle purchased for $4,982.00, which is operated without abuse to the vehicle or in an unreasonable manner, to last for more than 4,562 miles before the engine seizes up, even when purchased in an "AS IS" condition.
As to the second criteria of the aforementioned rule, the court finds that the defendant's actions were not immoral, unethical, oppressive or unscrupulous. The court finds that there was no intent to deceive on the part of the Defendant.
The third criteria to be determined is whether the Defendant's action or practice caused substantial injury to consumers. The independent nature of the consumer injury criterion does not mean that every consumer injury is legally CT Page 6449 "unfair," however. To justify a finding of unfairness, the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided (Citation Omitted) Id., 113. This court finds that the plaintiff's injury was substantial as it amounted to $2,444.17, and it is not outweighed by any countervailing benefits to consumers or competition that the practice produces. Further there is nothing the plaintiff could have reasonably done to avoid his injury.
CUTPA coverage is broad and its purpose remedial. Hinchliffev. American Motors Corporation, 184 Conn. 607, 616 (1981).
The plaintiff seeks damages of $11,514.00 for the loss of snowplowing revenue for the winter of 1992-1993. Since the plaintiff had never been in the snowplowing business prior to 1992-1993, he has used his snowplowing receipts for the winter of 1993-1994 to establish his loss. This court finds that the plaintiff did not prove his damages on the claim for snowplowing revenues and thus awards no such damages. Further the court does not award any punitive damages to the plaintiff as this court does not find any should be awarded under the facts of this case.
The court awards the plaintiff damages of $2,444.17 (Exhibit F) for the cost of the remanufactured engine and $87.75 for the rental of a vehicle between February 4, 1993 and February 8, 1993 (Exhibit E) for total damages of $2,531.92. The court also awards the plaintiff costs of suit and attorney's fees. The amount of the attorney's fees will be determined after a hearing on that issue.
The court further finds that the defendant did not sustain its burden of proof on its two special defenses. Judgment may enter accordingly.
SULLIVAN, J.