[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action brought primarily for the purpose of enforcing a right of first refusal. The plaintiff, Chunfong Lee, CT Page 11660 is a tenant on premises on which he and other family members operate a Chinese restaurant. The defendants are Beverly Farnell and Barbara Schiller, prior owners of the property in issue, and Konstantinos Filippopoulos, who purchased the property from Farnell and Schiller. The plaintiff's principal claim is that, in the circumstances of this case, he effectively exercised a right of first refusal contained in a lease between him and his brother-in-law, as lessees, and Schiller and Farnell, as lessors. Despite the attempted exercise of the right, the property was transferred to the defendant Filippopoulos ("Dino"). The plaintiff seeks the remedy of specific performance and an order declaring title to be vested in him, as well as damages and other relief pursuant to §§ 42a-110a et seq. of the General Statutes (Connecticut Unfair Trade Practices Act).
The trial of this matter, including sessions for argument, occurred on approximately fourteen separate days between March, 1997, and September, 1997. There is little or no dispute as to most of the dispositive facts.
Schiller and Farnell, as lessors, entered into a ten year lease with Lee and Jihe Zheng ("Jason"), Lee's wife's brother, effective September 1, 1987, for the premises at 773 Hopmeadow Street, Simsbury. Neither the lease nor a notice of lease was recorded on the land records. The lease contained a right of first refusal in paragraph 21.[1]
In 1989, Jason decided to pursue other interests. Apparently informally, he transferred his interest in the restaurant and in the lease to his sister, Mee Yung Cheng (Lee's wife). For some reason which is not entirely clear, an "assignment and assumption of lease" from Jason to Mee Yung was not formally executed until May, 1995. In the underlying lease there was a clause prohibiting assignment without permission of the lessors.[2] No one notified the lessors, or anyone in their behalf, of the assignment. Apparently rent has always been paid in a satisfactory manner, and there are no claims of any other difficulties under the lease.
As early as 1994, Schiller and Farnell decided to market the property. There was testimony that George Matt, the real estate agent acting on behalf of Schiller and Farnell, approached the tenants of the property, including Lee, concerning any interest they may have had in purchasing the property. No interest was expressed at the initial price of $300,000. In the summer of CT Page 11661 1995, however, the price was lowered, and on or about August 9, 1995, Schiller and Farnell on the one hand and Dino on the other entered into a contract for sale of the premises. The total price was $200,000. The terms were relatively simple: $1,000 was to be paid, and was paid, on the signing of the contract; $19,000 was to be paid, and was paid, on or before ten days after acceptance; and the balance of $180,000 was to be paid at the closing. There was no mortgage contingency clause. Dino agreed to take the property "as is", subject only to the outcome of an environmental inspection limited to "oil or other substances". The closing was to take place no later that November 30, 1995. The contract did not contain any reference to the prior right of first refusal, nor, at the time, was Dino aware of such a right.
Several extensions were granted so that Dino could complete the environmental work. He contracted to have old oil tanks removed and to conduct soil studies. He had paid the $1,000 deposit and the $19,000 intermediate payment, apparently in a timely manner. He worked with town officials, architects and engineers concerning his plan for the development of the neighborhood.[3] At the end of January, 1996, arrangements were made to close on the property by no later than February 29, 1996.
At the end of January, Dino's attorney, in preparation for the closing, collected copies of the leases. While the situation was not entirely clear, finding the lease between Schiller and Farnell and the plaintiff presented some difficulties. When Dino's attorneys finally read the lease, they were immediately concerned about the clause providing for a right of first refusal, as the clause had never been specifically dealt with. Dino's attorney at the time was Andrew Glassman; Raymond LeFoll and Tammy LeFoll represented Farnell. Schiller was formally represented by Deborah Tedford, but she apparently had agreed to have Farnell's attorneys negotiate on her behalf as well.
In any event, when the right of first refusal was discovered, Glassman of course insisted that it be resolved. The first effort, apparently, was to draft a "lease modification" which would have had the effect of eliminating paragraph 21 from the lease and of releasing all rights under the paragraph. This document was drafted by the LeFoll office and presented by George Matt to Lee at his restaurant on January 31, 1996. According to Matt, the presentation of the lease modification was entirely innocent, as, based on prior experience, he did not think that Lee had any interest in buying the premises in any event. CT Page 11662 According to the plaintiff, the presentation of the modification was a crafty way to try to avoid the problem of the right of first refusal, especially in light of Lee's lack of fluency in English.
In any event, Lee's daughter Ivy was summoned, and Ivy advised not to sign the document until they were more fully apprised of the situation. Ivy showed the document to James Tsui, a lawyer in Glastonbury whom Ivy knew. No one signed the lease modification except for Matt, who rather inexplicably signed the document as a witness before anyone else had signed.
Also on January 31, Tammy LeFoll sent by registered mail to Jihe Zheng and the plaintiff at the address of the subject premises a letter advising them that Schiller and Farnell had received the bona fide offer to purchase the premises for the amount of $200,000 and enclosed a copy of the contract with Dino. The letter further advised that the lessees had seven days from the date of the letter to exercise their right pursuant to paragraph 21 of the lease; if they did not accept "this offer", the privilege under the lease would expire and the right of first refusal would be null and void.
Lee received the letter on February 1, 1996. He held a family conference, involving himself, his wife, four daughters and two sons-in-law, and they made the decision to buy the property. He and his wife apparently did not have the wherewithal by themselves to buy the property, and his daughter Stella agreed to contribute $60,000. There was no evidence that Jason was notified of the offer or that he was involved in the attempted exercise of the right of first refusal in any way.
The Lee family consulted with Tsui, who wrote a letter to Tammy LeFoll on February 2, 1996. The body of the letter stated that "this office represents Chunfong Lee, who has accepted the offer to purchase the . . . property". Tsui also enclosed a "proposed Purchase and Sale Agreement" and a check in the amount of $1,000. Finally, Tsui requested LeFoll to notify all parties of Lee's intention to purchase the property.
The enclosed proposed Purchase and Sale Agreement evidently was taken from a document which Tsui had on disc. This proposal contained a number of deviations from the contract with Dino including, but not limited to, contingency clauses as to financing and the receipt of satisfactory reports as to the CT Page 11663 condition of the premises, the septic system, the water quality, heating and furnace, the absence of wood-destroying insects and lead paint, "and the environmental condition of the premises." The balance of the purchase price would be paid at the closing.
Tammy LeFoll responded to Tsui's letter and enclosure by letter dated February 5, 1996. In this letter, Ms. LeFoll said she had reviewed Tsui's client's "offer to purchase" the premises, and listed several "issues", including the addition of a mortgage contingency clause, the fact that Dino had agreed to take the property with environmental hazards which he was attending to and which raised the effective price of the property. She mentioned that the time for closing had been extended to no later than February 29, 1996. She said if Lee still wished to purchase the property, his "offer" should be revised "to conform exactly to the terms of the Filippopoulos contract", and she mentioned that $19,000 was due ten days after execution of the contract. If he did not wish to purchase, she would return to $1,000 deposit.
On receipt of Ms. LeFoll's letter, Mr. Tsui, after consulting again with his clients, revised the previous purchase and sale agreement by deleting the mortgage contingency clause and by adding a provision for the payment of $19,000 within ten days of "agreement date and upon rescission of prior contract". A closing date some time in May, 1996, was contemplated. The contingencies other than the financing provision remained in the revised purchase and sale agreement. This version was signed by Chunfong Lee. Mr. Tsui did not receive a written response to the February 6 correspondence.
Raymond LeFoll, Tammy's father, returned from vacation on about February 6. The case had been his, but Tammy was covering while he was on vacation. After Raymond's return, Tammy had nothing further to do with the matter. He reviewed what had happened in his absence. On February 7 or February 8, he had a conversation with Glassman. It seems apparent from the testimony of both Glassman and LeFoll that Glassman stressed that Filippopoulos still wanted the property, and both apparently felt that the right of first refusal had not been properly exercised. LeFoll knew that Filippopoulos had already spent thousands of dollars in reliance on his obtaining the property. It seems clear that if indeed the right had been properly exercised, the participants other than Lee would have found themselves in quite a bind. CT Page 11664
On February 8, LeFoll called Tsui. The recollections concerning this conversation differ somewhat. Tsui recalled that there was no conversation about the revised purchase and sale agreement and any possible deficiencies therein; rather, he said that LeFoll simply stated that his client would not sign the purchase agreement forwarded on February 6. LeFoll said that he told Tsui that the purported exercise was not proper because of the environmental contingency, the extended time for the closing, and the fact that only one of the two lessees attempted to exercise the right. According to LeFoll, Tsui responded that he would certainly be able to get the approval of Jason.
Tsui also had a conversation on February 8 with Glassman. Tsui recalled that Glassman raised some question as to whether the exercise was proper, but the discussion was somewhat vague. Glassman, according to Tsui, was interested in knowing what sort of leasing arrangement Tsui's clients might want to pursue with Filippopoulos. Tsui, though he had no authority concerning leasing the premises, finally tossed out a low rental figure for a long term. Tsui also testified about another conversation with LeFoll, in which LeFoll said he would not have the closing without first notifying Tsui.
A fair synthesis of the telephone calls around February 8 may be stated as follows. Tsui stated that he was never informed of any precise claimed deficiencies in the exercise of the right, although LeFoll did tell him that his client did not intend to sign the agreement. Tsui was apparently waiting for LeFoll to send another revision. Shortly afterwards, both Glassman and LeFoll expressed an interest in extending the lease. LeFoll maintains that he quite explicitly told Tsui what he thought the deficiencies were.
In any event, Tsui received no further word from either Glassman or LeFoll in the next several days, and on February 14 he sent another letter to LeFoll. He expressed considerable concern that he had not heard from LeFoll; he had thought that the parties ought to be agreeing on the terms of a contract. He strenuously maintained that his side had exercised the right properly, and that he had not received any concrete suggested revisions to the purchase and sale agreement that he forwarded to LeFoll on February 6. He suggested that surely the other parties ought to have known of Lee's right of first refusal all along. A copy of this letter was apparently sent to Glassman. CT Page 11665
Rather than respond to Tsui's letter, LeFoll, apparently believing that the exercise had not been proper and that the time for exercise had passed, wrote an opinion on February 16, 1996, to a title insurance company. He enclosed copies of various correspondence concerning the exercise of the right of first refusal and concluded that the attempted exercise had been ineffective, because "the contracts submitted by Attorney Tsui failed to list both lessees as purchasers and further failed to meet the same terms and conditions as set forth in the Filippopoulos contract." Most troublesomely, the opinion letter states that Tsui was told that the offer was rejected and the deposit money returned. The letter also enclosed, as one of the attachments, a copy of a letter from LeFoll to Tsui dated February 15, 1996, in which LeFoll informed Tsui that the exercise was ineffective because of the absence of Jihe Zheng and the variations between the terms of the Filippopoulos contract and the contracts proposed by Tsui. He further accused Tsui of trying to extort gain by interfering with the sale of the property to Dino. He returned the deposit of $1,000. LeFoll did not actually send this letter to Tsui until February 26, 1996, which was four days after the closing; LeFoll changed the date of the letter from February 15 to February 26.[4]
As mentioned above, the closing did occur on February 22, 1996, and Filippopoulos now has title to the property. Shortly after receiving the letter of February 26, 1996, Lee did indeed institute this action.
The primary issue for resolution is whether the plaintiff effectively exercised the right of first refusal. All sides agree that the leading case in Connecticut is Smith v. Hevro RealtyCorporation, 199 Conn. 330 (1986). In Smith, Hevro was the owner of the premises in issue, and Carpet Center was a tenant with a right of first refusal. In June of 1983, Hevro signed a contract with Smith, the plaintiff, for the sale of the property. This contract included a clause specifically making the contract subject to Carpet Center's right of first refusal. The contract required a deposit of $40,000 toward the purchase price of $400,000, the balance of which would be paid at the closing. On June 24, 1983, Hevro sent notice of the contract with Smith to Carpet Center, along with a copy of the Smith contract; the notice indicated that Carpet Center could exercise the right of first refusal "on the same terms and conditions" as were contained in the Smith contract if the right were exercised in CT Page 11666 writing and postmarked no later than July 24, 1983.[5] On July 22, Carpet Center responded: it said that it was exercising the option and asked Hevro to send a "proposed contract". Although the acceptance was postmarked July 22, it was not received until August 6 or 7.
On August 8 or 9, Hevro's attorney wrote to both Smith and Carpet Center to report that Carpet Center had exercised its right of first refusal and returned Smith's deposit check. Smith objected, and said that Carpet Center's purported exercise of the right of first refusal was not effective. Hevro, then, wrote to Carpet Center and said that Carpet Center's acceptance was "incomplete" without the deposit check of $40,000; Hevro extended the time in which to send the $40,000 to August 17. Carpet Center responded that it would not send a check until a contract was signed. At this point Hevro decided to let the two contenders contest the matter. The trial court concluded that the exercise was ineffective for two reasons: the notice of acceptance was untimely, and the acceptance did not conform precisely to the terms of the offer.
The Connecticut Supreme Court expressly did not reach the first ground, that is, that the exercise was untimely. The court, through Chief Justice Peters, stated that acceptance under an option contract is generally not effective until received, and as receipt of the acceptance was beyond the thirty day period provided for in the lease, the acceptance ordinarily would be untimely. The facts in this case were somewhat different, however, in that the letter in which Hevro sent notice of the bona fide offer to purchase specifically allowed for the date of the postmark to govern timeliness. The trial court had held that Hevro's waiver of the time limitation could not be binding on Smith, who was entitled to have his contractual expectation nullified only by a validly exercised right of first refusal. The trial court also held that Carpet Center had not effectively exercised the right because it did not tender the $40,000 deposit either at the time of its purported acceptance or within a reasonable time. Carpet Center contended that the deposit was due only on the execution of a contract with Hevro.
In order to resolve the latter claim, the Supreme Court discussed in some detail the principles governing the exercise of rights of first refusals. A right of first refusal is a right to purchase property on the same terms as those proposed by a third party purchaser. The right does not arise until the owner wishes CT Page 11667 to sell the property and he receives an acceptable offer from a bona fide purchaser. Smith, supra, 335. When these two conditions occur, the owner is required, "before it [sold] the [property] to some third party, to offer it to [the holder of the right] on the same terms it was willing to accept from the third party." Smith, supra, 336. When the owner notifies the holder of the right of those two conditions, the right of first refusal ripens into an option, which is "a continuing offer to sell, irrevocable until the expiration of the time period fixed by agreement of the parties, which creates in the option holder the power to form a binding contract by accepting the offer." Smith, supra.
The rules governing acceptance of the offer are quite strictly construed. "To be effective, an acceptance of an offer under an option contract must be unequivocal, unconditional, `and in exact accord with the terms of the option' (citations omitted). Where there is ambiguity, option contracts are construed against the optionee. Where an agreement calls for the payment of some or all of the purchase price to exercise the option, the optionee must not only accept the offer but must pay or tender the agreed upon amount within the prescribed time." Smith, supra, 338-39.
In the circumstances presented in Smith, then, the underlying lease provision and the notice to Carpet Center, together with a copy of the Smith contract, constituted a binding offer to sell the property to Carpet Center on the terms and conditions of the Smith contract. A simple acceptance would complete the contract, such that a second written contract between Hevro and Carpet Center was not necessary to supply essential terms and Carpet Center had no right to insist on one. Therefore, Carpet Center had the obligation to tender the deposit, which, so far as we can tell, it never did. The court further found that the obligation to tender the deposit was not waived or excused by Hevro's extension of time in which to do so, though the court noted (at 342 n. 13) that, in light of Smith's rights under the its contract with Hevro, there may be some question as to whether Hevro unilaterally could validly extend the optionee's time for performance. The court, then, affirmed the trial court's holding that Carpet Center did not effectively exercise the right of first refusal, and that the contract with the third party Smith was enforceable.[6]
Some of the holdings of Smith can be applied directly to the case at hand. First, it is absolutely clear that no further contract was necessary to effect an acceptance of the option, if CT Page 11668 the acceptance were made properly. When Tsui, having received the notice from Tammy LeFoll and the copy of the contract with Filoppopoulos on February 1, 1996, responded on the next day, an unequivocal acceptance would have formed a binding contract between the owners and Dino.[7]
Second, Smith states in emphatic language that the acceptance, to be effective, must be unequivocal, unconditional and in exact accord with the terms of the option; Smith, supra, 339, and citations therein; further, if there are ambiguities, they are to be strictly construed against the optionee. See alsoPleines v. Franklin Construction Company, 30 Conn. App. 612,616-17 (1993).
Finally, Smith makes it clear that strict adherence to other conditions of the acceptance, such as tender of the required deposits, is also necessary for successful acceptance. In light of the holdings in this case, I need not reach this issue.
I find that Lee, acting through his attorney, did not satisfy the exacting standard for accepting the offer established bySmith. The letter of February 2, 1996, did state that Lee has accepted the offer. The letter goes on, however, to discuss a new purchase and sale agreement, and encloses as a proposal for consideration which differs in several significant respects from the Filoppopoulos contract. Tammy LeFoll's letter in response does indeed specifically refer to the mortgage contingency, which was immediately deleted by Tsui, but it also rather emphatically insists on adherence to the exact terms of the contract with Dino. The contract forwarded to her the next day again contained substantial deviations from the contract with Dino. Tsui testified that he thought that once the option was "accepted", he and the owners could negotiate a new contract. Though Tammy LeFoll's responses were not entirely unambiguous, I do not find an intent to deliberately mislead Tsui, and she quite properly insisted on strict adherence to the terms of the original contract. Although Tsui purported to "accept" the option, his suggestions concerning substantial alterations, and, indeed, his insistence on further negotiations rather than the ministerial execution of a "suitable contract", amounted to an equivocal acceptance at best.
The application of an exacting standard governing the acceptance of the option, though perhaps superficially harsh, is grounded in sound policy. While two parties who are negotiating a CT Page 11669 contract are, with some necessary limitations, free to do as they please, the addition of a third party, who has entered into an otherwise enforceable contract, changes the equation. Insistence upon strict compliance with a preexisting right of first refusal has the salutory effect of protecting the third party's contractual rights.
I also find that the acceptance by only one of the lessees constituted an ineffective acceptance. Although Jason had assigned his interest to Mee Yung, the owners had not given permission for the assignment nor did they know of the assignment. As stipulated by the plaintiff, the assignment was, then, ineffective as to them. Lamenza v. Shelton, 96 Conn. 403
(1921), involves a similar factual scenario: one of two lessees sold his interest in the business and left the business. The remaining lessee sought to exercise an option to renew the lease. The Supreme Court held that an option to renew cannot be effectively exercised by only one of two lessees. Because a mature right of first refusal is, after all, an option, I find that Lamenza is binding.[8]
As aptly pointed out by the plaintiff, there is authority supporting the opposite contention. See, e.g., R.H. PierceManufacturing Corporation v. Continental Manufacturing Co., Inc.,679 P.2d 142 (Idaho 1984). One difficulty is what to do with the absent lessee: one answer suggested by Am.Jur.2d[9] and R.H.Pierce is that the exercising lessee then holds the option right subject to a constructive trust in favor of the non-exercising optionee. In addition to the inherent awkwardness of the resulting constructive trust, it seems to me that a requirement that a right of first refusal be exercised by all of the lessees, in order to be effective, is consistent with the stringent standards for acceptance of the option set forth in Smith, supra. As a right of first refusal is, in a sense, a restriction on the free transferability of property, its exercise ought to be strictly construed.[10]
In light of the foregoing, I need not decide the other central issue of whether, even if the option were effectively exercised, the plaintiff was ready, willing and able to perform the contract.[11] Similarly, the equitable issues raised by both parties concerning the remedy of specific performance need not be decided.[12]
The first count, then, is decided adversely to the plaintiff CT Page 11670 because the acceptance was deficient for the two independent reasons stated above. As a result, the second, third and fourth counts, which rely on allegations that "the plaintiff had exercised his option and had tendered a duly executed purchase and sale agreement to defendant-sellers as required therein" (paragraph 11 of the revised complaint dated May 21, 1996), must be decided in favor of the defendants as well.
Finally, the defendants Schiller and Farnell have filed a counterclaim seeking a "declaration" that the assignment from Jason to "Chun Fung Lee's wife" had the effect of terminating the lease as of the date of the assignment, and thus extinguishing the right of first refusal. In the second count, the counterclaim seeks damages for the resulting "fraud", and the final count alleges an unfair trade practice pursuant to CUTPA (§§ 42-110a
et seq. of the General Statutes). These claims may be treated summarily.
First, the lease was not terminated. Although the purported transfer may have been accomplished in violation of the lease, a lease is not terminated in the absence of an unequivocal act.Housing Authority v. Hird, 13 Conn. App. 150, 155 (1988);Mayron's Bake Shop, Inc. v. Arrow Stores, Inc., 149 Conn. 149,156 (1961). Additionally, the purported assignment caused no harm to the owners in any event. The reliance on Brauer v. Freccia,159 Conn. 289 (1970), is misplaced; in Brauer, language in the clause providing for the option specifically required, as a precondition for the exercise of the option, that the optionee not be in default. As the lessee was in default at the time, the lessor was permitteed to refuse to honor the attempted exercise of the option. There is no such language in the instant case.
There also is no clear and convincing evidence of fraud. The elements of fraudulent nondisclosure are set forth in Gelinas v.Gelinas, 10 Conn. App. 167, 173 (1987). Suffice it to say that in this case there is no evidence that the assignment was made with any fraudulent intent, and no credible evidence that any nondisclosure was intended to mislead anyone.
Finally, I do not find that the course of conduct violated CUTPA, as there is no statutory violation and, in the context of this case, no conduct that can reasonably be characterized as immoral, unethical or generally unscrupulous. After consideration of all the factors outlined in cases such as Conaway v. Prestia,191 Conn. 484, 492-93 (1983) and Cheshire Mortgage Services v.
CT Page 11671Montes, 223 Conn. 80, 105-06 (1992), I find that there is no persuasive evidence that Lee engaged in any practice that was especially deceptive or violative of public policy.
Judgment may enter for the defendants on the complaint and for the defendant on the counterclaim (Lee).
Beach J.