[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff's April 22, 1998 revised complaint sets forth, in three counts, the following claims. The first count alleges, inter alia, that defendants, Fantry and Miller, "schemed to defraud the plaintiff creditor, and to protect the investment of the Defendant John Fantry, by engaging in the following acts: (a) without fair and reasonable compensation, the Defendant Mobilmed, LLC occupied the premises of MOBILEMED, Inc.; (b) without fair and reasonable compensation the Defendants John Fantry and William G. Miller took over MOBILEMED, Inc.'s customer list and contracts and business of MOBILEMED, Inc. and transferred them to Mobilmed, LLC; and (c) without fair and reasonable compensation sold the business of MOBILEMED, Inc. to Mobilmed, LLC." Revised Complaint, April 22, 1998, paragraph 12. The plaintiff further claims that these actions of Fantry and Miller diminished the value of the securities of MOBILEMED, Inc. (TNC) to the detriment of the plaintiff thereby affecting the ability of the plaintiff to recover the $50,305 judgement it had obtained against the sole shareholder of INC. Lawrence Cassol. The plaintiff further claims that the actions of the defendants, Fantry and Miller, deprived INC of the ability to pay the plaintiff $26,401.70 owed to it by INC. The second count alleges that all of the defendants were unjustly enriched by virtue of the transfer of assets for less than fair and reasonable compensation. The third count alleges a violation of the Connecticut Unfair Trade Practices Act (CUTPA).
The defendants answered the complaint and raised two special defenses. The first special defense claims that either one, two or all of the defendants were creditors of INC by virtue of their CT Page 5877 "infus(ed)ing a sum in excess of SIX HUNDRED THOUSAND ($600,000) DOLLARS into MOBILEMED SUPPORT SERVICES, INC. as bona fide creditors of said Corporation and therefore are creditors of said Corporation in the same standing as the Plaintiff and other creditors of the Corporation." Answer and Special Defenses, June 15, 1998. The second special defense alleges that "One, two, or all of the Defendants, for a sum in excess of SIX HUNDRED-THOUSAND ($600,000) DOLLARS purchased the assets of MOBILEMED SUPPORT SERVICES, INC. for full and adequate consideration."
P.B. § 10-3 requires that the statutory section be set forth in the complaint if the claim is grounded on a statute. The plaintiff has failed, in his amended complaint, to meet this requirement. However, in its Trial Brief dated March 9, 1999, the plaintiff cites General Statutes § 52-552e, § 52-552f, and § 52-552h. Thus the court will consider count one as having been grounded in the Uniform Fraudulent Transfer Act (Act). The defendant raised no objection and at trial raised no issue with respect to the discussion of the ACT as the underpinnings of the plaintiffs first count. See Goodrich v. Diodato,48 Conn. App. 436, 443, 710 A.2d 818 (1998).
 I
The court finds the following facts. On March 1, 1996 John Fantry obtained an option from the owner, Cassol, to purchase the assets of INC. Plaintiff's Exhibit Q. Upon obtaining that option, Fantry assumed operation and control of INC. In March 1996, INC was in dire financial shape although the extent of the problems were not known to Fantry. In order to keep INC operating, Fantry was required to immediately fund approximately $17,000 for payroll.
INC had a number of service contracts with various customers which provided for the rendering of services at agreed upon rates, but allowed either party to cancel upon sixty days notice. These contracts were non-exclusive. In other words, the customer was free, even during the term of the contract with INC, to seek services elsewhere. INC's assets, in addition to the contracts, included a number of owned vehicles of little value, furniture, fixtures, equipment, and goodwill. On March 1, 1996 the corporation had no available cash. Also at that time, INC was factoring its receivables and continued to do so through the relevant period of time. The tangible assets, at the time of Fantry taking over operational control, had a value of $150,000 CT Page 5878 which included a $50,000 deposit that the factoring company was holding as security. Fantry had been told that INC's payables at the time he took over the corporation were approximately $200,000. In actuality he determined after taking over control that they were in excess of $750,000.
Upon taking over the operations of INC, Fantry recognized the need to obtain a line of credit to attempt to work the company out of its financial problems. Upon approaching lenders he found, not unsurprisingly, that secured financing was not available to INC and that the contracts with customers were not bankable due to the term and non-exclusive nature of the contracts. Fantry also discovered that the prime customer of INC had a strong relationship with William Miller who had previously been employed by INC and at one point was its president. Miller had left the employ of INC prior to Fantry acquiring an option to purchase the stock and taking over operational control. At the time Miller left INC, he was owed $60,000 for cash that he had infused into the corporation. When Fantry was advised that INC would not retain their principal client if Miller was not with the corporation, Fantry brought Miller into the corporation and placed him in control of operations. Fantry believed that the contracts had value so long as Miller was with the corporation. It is clear from the testimony that INC was insolvent at the time that Fantry took over the operations of INC and remained insolvent through the point when the assets of INC were transferred.
Late in 1996 it became obvious that INC had little hopes of surviving without a dramatic influx of capital or a reorganization of some kind. In December, 1996, Fantry filed papers with the Secretary of State to create a limited liability corporation (LLC)[1] The purpose of the LLC was to acquire the assets of INC and to continue in the same business as INC. Fantry and Miller were both members of the LLC.
In December of 1996 Miller and Fantry were controlling the financial and day to day operations of INC. In January 1997, Miller and Fantry ceased operating as INC. The customer contracts with INC were, over a period of six months, rewritten in the name of LLC. The payments for work done for customers by LLC were deposited in the account of LLC irrespective of whether the contracts were in the name of INC or LLC. Monies received by LLC for work done by INC were forwarded to the factoring company for the benefit of INC's account. CT Page 5879
In January 1997, the assets of INC were transferred. It is not clear from the testimony as to whom they were transferred. This is due to the total lack of documentation of the transaction and the conflicting information on the 1997 tax return of the LLC. That return indicates that the LLC commenced business operations on March 1, 1997[2]. What is clear is that Fantry and Miller controlled and directed all the actions of LLC and INC during the relevant time period and had control over the disposition of the assets.
A. Value of the Assets Transferred
The value of the assets at the time of the transfer, as set forth on the tax return for the LLC, Plaintiff's Exhibit C, Schedule 4562, pg. 2, was $634,000. On that return the LLC sets forth that $534,104 was attributable to customer contracts and goodwill and $100,000 to tangible assets. The testimony of Fantry confirmed that the furniture, fixtures and equipment were worth "at most" $100,000. The bill of sale indicates a value of $120,000 for the sale of the corporate name, contracts, office furniture and fixtures, and all equipment including tools and vehicles. Plaintiffs Exhibit P. Despite evidence reflected on the tax return, the court is not satisfied that this reflects the true value of the corporate assets transferred nor does the court accept the valuation contained in the bill of sale. The testimony supports that the value of the equipment was approximately $100,000 and that the value of the contracts was minimal. The value of the contracts and goodwill cannot be determined based upon the credible testimony presented. Thus the most that can be determined from the credible evidence presented is that on the date of transfer the value of the assets exceeded $120,000. but was less than $634,000.
B. Consideration Paid for the Assets
The defendants claim that they paid fair and reasonable value for these assets. They claim that the LLC paid $300,000 in cash to INC in partial consideration. These monies were then used by INC to pay certain trade creditors of INC. As additional consideration the defendants claim that LLC assumed other liabilities of INC. These included the Bandana loan in the amount of $126,832, the Caddy loan in the amount of $55,000, the Fantry loan in the amount of $53,504, and the Miller loan in the amount of $45,053, see Plaintiff's Exhibit AA, Schedule L, Statement 11. CT Page 5880 Additionally the defendant claims to have paid on behalf of INC $85,000 in past due taxes owed to the IRS. Thus the defendants claim that value in the amount of $665,389 was given for assets valued at between $120,000 and $634,000. No supporting documentation was offered for the claimed payment of $300,000 to INC or its trade creditors. Nor was any evidence presented as to the source of the funds used to pay the $300,000. Neither Fantry nor Miller claim to have infused any new capital into the operation. Any trade creditors paid by Fantry, Miller, or the LLC for the benefit of INC must have been paid out of revenues of the new operation. Additionally the 1996 and 1997 federal tax returns for INC support, at best, value given to INC in exchange for the assets of $515,914.[3] The court finds that $515,914 as the consideration given in exchange for the transfer.
C. The Plaintiff's Claim
The plaintiff is an insurance agency that over the course of a number of years prior to 1996 had sold policies of insurance to INC and a number of other entities owned by Cassol. After INC's default in the premium payment, the plaintiff commenced a collection action seeking damages in the amount of $58,108. The action was commenced in April 1996 when the plaintiff sought to attach the "securities of the defendant corporations" (including INC) as well as a certain payment due the various corporations from the Hartford Insurance Company (the "Hartford"). As a result of the request for a pre-judgement attachment the defendant agreed to turn over the payment due from the Hartford. On September 8, 1997, judgment entered against INC in favor of the plaintiff in the amount of $14,974.30. On December 22, 1997 that judgment was reopened and modified to $26,401.70. Judgement also entered against Cassol, the owner of INC, in the amount of $50,305.00. Additional facts will be made as necessary in the discussion of the issues.
 II
A. The Fraudulent Transfer Act
The Uniform Fraudulent Transfer Act (Act), codified as General Statutes § 52-552a through 1, was enacted pursuant to P.A. 91-297. The Act sets forth in § 52-552e and § 52-552f
four situations when a transfer of assets or the incurring of an obligation[4] is to be construed to be a fraudulent transfer under the Act. CT Page 5881
(1) General Statutes § 52-552e (a)(1)
General Statutes § 52-552e (a)(1) requires proof that the plaintiff was a creditor at the time the transfer occurred and tha the debtor intended by making the transfer to hinder, delay or defraud any creditor. This section does not require the plaintiff to prove the debtor was insolvent at the time of the transfer, nor that the transfer rendered the transferor insolvant, nor that the transfer was for fair value, nor that the transfer was to an insider. However proof of any of these facts or any of the other common indicia of a fraudulent transaction as set forth in General Statutes § 52-552e(b)[5] may be considered by the trier of fact in determining whether the debtor had the requisite intent to hinder delay or defraud creditors.
Clearly the plaintiff has shown that INC was insolvant at the time of the transfer. However it was also insolvant at the time Fantry and Miller took over operations. The defendants attempted to operate INC for nine months before realizing that their endeavors were futile. They sought to work out an arrangement with the plaintiff and agreed to turn over the Hartford Insurance proceeds to the plaintiff which reduced the plaintiffs claim by almost fifty percent. In December 1996 the options open to the defendants were to cease operating or to reorganize. The defendants did not employ the skills or methods to reorganize properly[6]. Their intention was to attempt to save the company and the jobs of the numerous people who worked for the company. The defendants were aware that, if the company liquidated, the contracts would be valueless and that the creditors would receive a minimal dividend. The receivables would have gone to the factor and the only assets available for creditors would be the liquidation value of the furniture, fixtures, and equipment. The burden on the plaintiff is to demonstrate this fraudulent intent by clear and convincing evidence. The court finds that the plaintiff did not meet its burden[7].
(2) General Statutes § 52-552e (a)(2)
General Statutes § 52-552e (a)(2) requires proof that the plaintiff was an existing creditor of the debtor at the time of the questioned transfer and to demonstrate that a transfer occurred that was not for "reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond CT Page 5882 his ability to pay as they became due." An action brought under General Statutes § 52-552e (a)(2) deems any conveyance or transfer of assets fraudulent as to creditors, without regard for the intent of the transferor, if the transfer was made without fair consideration and it rendered the transferor unable to pay its obligations as they become due or otherwise leaves the transferor under-capitalized. The plaintiff need not demonstrate that the transaction was to an insider nor that the debtor was insolvent at the time of the transfer.
The plaintiff cannot prevail under this section as there was no evidence that the debtor either continued in business after the transfer of assets was accomplished or incurred additional debt. The business was wound down after the transfer of assets. The accountant for the debtor prepared a final tax return for INC, Plaintiff's Exhibit AA, winding up the business in 1997. The owner of INC had moved out of the state, and that all of the assets of INC had been transferred. Thus the plaintiff has failed to demonstrate either alternative set forth in General Statutes § 52-552e (a)(2).
(3) General Statutes § 52-552f(a)
General Statutes § 52-552f(a) requires the plaintiff prove that he was an existing creditor at the time of the transfer, that the debtor was insolvent at the time of the transfer or that as a result of the transfer was rendered insolvent, and the transfer was not for a reasonably equivalent value. There is no requirement that the petitioner prove that the transfer was to an insider or that the intent of the debtor was to hinder, delay or defraud creditors. With respect to General Statutes § 52-552f
(a) again there is no dispute that the plaintiff was a creditor of INC at the time of the transfer. Also undisputed is the fact that there was a transfer or that INC was insolvent at the time of the transfer. Thus the only issue necessary to determine under this section is whether the transfer was for reasonably equivalent value.
The definition of the term value as used in the Act is found in General Statutes § 52-552d(a). "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of promissor's business to furnish support to the debtor or another person." CT Page 5883
Evidence as to the value of the assets was adduced through the testimony of the principals of LLC and the accountant. The accountants information, however, was merely a recitation of information that he had received from Fantry and Miller. The accountant did no independent valuation nor did he audit the books and records of either INC or LLC. He did however prepare the income tax returns for both LLC and INC. Not surprisingly those returns were consistent with one another as to how they treated the transfer of assets between the two entities[8].
The plaintiff also offered no appraisal evidence as to the value of the assets of INC at the hearing but rather urged the court to accept $689,230. as the value of the assets transferred. Plaintiff's Post Trial Brief, April 16, 1999, pg. 3. This value is taken from the tax return of LLC, Plaintiff's Exhibit AA.[9]
As previously noted the court can only determine that the asset value ranges between $120,000. and $634,104. The burden of establishing the value of the assets transferred and whether there has been reasonable value given in exchange is the plaintiffs. The evidence as to value is contradictory and does not support a specific finding of value. The court also found that the defendants gave $515,914. in exchange for those assets. This may or may not be adequate consideration for the assets transferred. Thus the plaintiff has failed to demonstrate that the defendants have transferred assets for less than reasonably equivalent value in violation of General Statutes Section 52-552
(f)a.
(4) General Statutes § 52-552f(b)
General Statutes § 52-552f(b) requires the plaintiff prove that it was an existing creditor of the debtor. Additionally the creditor must show that the transfer was to an insider for an antecedent debt, and that the debtor was insolvent at the time of the transfer and the insider knew or reasonably should have known of the debtor's insolvency. The plaintiff is not required to show that the transfer was not for fair value nor prove that the transferor had any intent to hinder, delay, or defraud creditors. The Act does not proscribe the preferring of one creditor over another by the debtor except in one specific situation. General Statutes § 52-552f(b) prohibits an insider from preferring the payment of an obligation owed to an insider over that of an existing general creditor if the transferor is insolvent at the time of the transfer. CT Page 5884
The testimony is uncontroverted that assets of INC were transferred at a time when the plaintiff was an existing creditor of INC. LLC was specifically established by Fantry and Miller as a vehicle to continue the business of INC after acquiring INC's assets. Fantry also testified as to the dire financial shape that INC was in when he took it over in March 1996, and that INC was insolvent at the time of the transfer of the assets of INC. This is also confirmed by other documentary evidence. It is also undisputed that part of the consideration for the transfer of assets to LLC was the assumption of antecedent debt owed to Fantry and Miller. Thus if the defendants are "insiders", within the meaning of General Statutes § 52-552b(7), the plaintiff must prevail under this statutory section. The court finds that the defendants, Fantry and Miller, were in control of the transferor, INC, at the time of the transfer and thus within the meaning of "insider" as defined in General Statutes § 52-552b(7) (B) (iii). Fantry's option to purchase the stock of INC coupled with the operational and financial control that Miller and Fantry exercised over INC from March 1996 until at least the transfer was complete, as well as the absence of Cassol from the decision making process require a finding that Miller and Fantry were insiders. Therefore the court finds the transfer violated General Statutes § 52-552f(b).
Therefore the court finds the defendants, Fantry and Miller liable to the plaintiff on the first count of the complaint and that the plaintiff has been damaged in the amount of $26,401.70. The plaintiff, however, seeks to collect $50,305. in damages as it claims that the value of Cassol's shares in INC were diminished by virtue of the transfer of the assets of INC to LLC thus making the additional sum of $23,904.30 uncollectible. The evidence does not support this claim. Immediately prior to the transfer INC was insolvent as defined in General Statutes Sec.52-552c(a). Assuming the assets of INC had been sold to a third party, who was not an insider, for fair value there is no evidence that Cassol would have received any return of equity and therefore the plaintiff has failed to prove that he has been damaged as a creditor of Cassol by virtue of the defendants actions. The plaintiff also seeks an award of attorney fees for prosecution of this claim. No evidence of the amount of attorney fees claimed was offered at trial. Additionally the statute does not provide for the assessing of attorney fees and none are awarded.
B. Unjust Enrichment
CT Page 5885
The plaintiff claims in count two of its complaint that the defendants were unjustly enriched by virtue of the transfer of assets. The plaintiff cannot prevail on this count because they have failed to establish that Fantry, Miller, or LLC was unjustly enriched. The plaintiff failed to adequately prove the value of the assets transferred and thus cannot demonstrate the degree, if any, that the defendants have been enriched.
C. Connecticut Unfair Trade Practices Act
The plaintiff's final claim is that the fraudulent transfer of assets by the defendants violated CUTPA. In determining whether this transaction violates CUTPA the court must apply the "cigarette rule" as adopted by the Supreme Court in Canaway v.Prestia, 191 Conn. 484, 492-93, 46A A.2d 847 (1983). In determining whether a practice is unfair three criteria are applied: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise. . . . (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen]." CheshireMortgage Service, Inc. v. Montes, 223 Conn. 80, 106 (1992), quoting Canaway v. Prestia; 191 Conn. 484, 492-93 (1983).
All the criteria need not be satisfied in order to support a finding that the practice is unfair. "A practice may be unfair because of the degree to which it meets one criteria or because to a lesser extent it meets all three." Cheshire MortgageServices, Inc. v. Montes, 223 Conn. 80, 106 (1992). Under the facts of this case the plaintiff has satisfied only the first of the three criteria. While meeting only one criteria may be sufficient to warrant liability, the degree to which it meets that criteria must be weighed. The court finds that the plaintiff has failed to meet the first criteria to a sufficient degree to override its failure to meet either of the other criteria.
General Statutes § 52-552a does set forth various conditions under which the transfer of property will not be effective as to a certain class of creditors. In the present matter the transfer of property to an insider of the transferor for an antecedent debt is proscribed. General Statutes §52-552 (f)(b). The public policy considerations contained in §52-552 (f)(b) are not as strong or compelling as those set forth CT Page 5886 in § 52-552e(a)(1) or (2) or § 52-552 (f)(a). Each of these sections prohibits either a transfer with an actual intent to hinder, delay or defraud creditors or the transfer of assets for less than reasonably equivalent value. This establishes a clear public policy against breaches of established concepts of fairness. Section 52-552f(b), on the other hand, establishes a priority for the payments of general creditors before "insider" creditors. This priority is established without regard to the validity of the insiders debt. Thus while § 52-555f(b) establishes a public policy with regard to this type of transaction it is not grounded in fairness to the degree that § 52-552e(a)(1) and (2) or § 52-552f(a) are. As to the second prong of the "cigarette" rule the transaction prohibited is not immoral, unethical, oppressive or unscrupulous. Rather, as previously noted, it establishes a system of priorities that prevent bona fide loans by insiders from being repaid to the detriment of other general creditors.
As to the third prong of the test the practice engaged in by the defendants in this case did not cause substantial injury to consumers, competitors or other businesses. The plaintiff commenced an action against Cassol in early 1996 and attached the securities of INC. They clearly had the option to bring suit against INC and attach all of its assets at that time. The transfer did not occur until January 1997 and thus the injury was one that the plaintiff could have reasonably avoided. SeeCheshire Mortgage Services, Inc. v. Montes, 223 Conn. 80, 113. Thus weighing all three factors the court finds no violation of CUTPA.
D. Remedies for Violation of the Act
Having found the plaintiff damaged in the amount of $26,401.70, the court considers next what the appropriate remedy is under General Statutes Sec. 52-552h. That section of the Act delineates a number of remedies that the court may entertain. Those remedies include the attachment of assets or the avoidance of the transfer. However when equity requires the court may grant "any other relief the circumstances may require." General Statutes Sec. 52-552h(a)(3)(C).
In the present situation attachment of the assets is not practical as they have been transferred to the LLC and are no longer recognizable as the former assets of INC. The contracts have been rewritten in the name of the LLC and may contain CT Page 5887 different terms and conditions. Some of the contracts at this point have expired. The LLC also has other members who were not members when the original entity was formed.[10] There was also no evidence of the present existence of any of the furniture, fixture and equipment that was transferred. However Fantry and Miller were repaid on there loans to INC, which were assumed by LLC, as a result of the transfer of assets. In fact Miller's loan was paid in excess of what he was owed. Fantry's loan was also repaid. Both of these loans were in excess of $26,401.70. Therefore the court enters judgement against Fantry and Miller in the amount of $26,401.70.
Zarella, J.